[No. S141643. July 16, 2007.]

CITY OF SANTA BARBARA et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA BARBARA COUNTY, Respondent;
TERRAL JANEWAY et al., Real Parties in Interest.

748

**COUNSEL**

Stephen P. Wiley, City Attorney, Janet K. McGinnis, Assistant City Attorney; Haight, Brown & Bonesteel, Peter Q. Ezzell, Nancy E. Lucas; Jarvis, Fay & Doporto and Andrea J. Saltzman for Petitioners.

Dennis J. Herrera, City Attorney (San Francisco), Joanne Hoeper, Chief Trial Deputy, and Donald P. Margolis, Deputy City Attorney, for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Petitioners.

Jane H. Adams for California Park & Recreation Society as Amicus Curiae on behalf of Petitioners.

Chapman, Glucksman & Dean, Arthur J. Chapman and Cynthia R. Lane for Sierra Club as Amicus Curiae on behalf of Petitioners.

Manning & Marder, Kass, Ellrod, Ramirez and Anthony J. Ellrod for International Health, Racquet and Sportsclub Association and California Clubs of Distinction as Amici Curiae on behalf of Petitioners.

Prindle, Decker & Amaro, Michael L. Amaro and Jack C. Nick for Bally Total Fitness Corporation and 24 Hour Fitness USA, Inc., as Amici Curiae on behalf of Petitioners.

Agajanian, McFall, Weiss, Tetreault & Crist, Paul L. Tetreault and William D. Anthony for National Association of Stock Car Racing, Inc., and The California Speedway Corporation as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Grassini & Wrinkle and Roland Wrinkle for Real Parties in Interest.

## OPINION

**GEORGE, C. J.**—The mother of Katie Janeway, a developmentally disabled 14 year old, signed an application form releasing the City of Santa Barbara and its employees (hereafter the City or defendants) from liability for "any negligent act" related to Katie's participation in the City's summer camp for developmentally disabled children. Katie drowned while attending the camp, and her parents (plaintiffs, real parties in interest in the present proceedings) commenced this suit. The Court of Appeal below (1) held unanimously that the agreement embodied in the application form was effective and enforceable insofar as it concerned defendants' liability for future *ordinary* negligence, but (2) concluded, by a two-to-one vote, that a release of liability for future *gross* negligence generally is unenforceable, and that the agreement in this case did not release such liability.

In granting review, we limited the issue to be briefed and argued to the second issue—whether a release of liability relating to recreational activities generally is effective as to *gross* negligence.[1] As explained below, we answer that question in the negative, and affirm the judgment rendered by the Court of Appeal. We conclude, consistent with dicta in California cases and with the

---

[1] Subsequent to hearing oral argument, we directed the parties to brief the first issue decided by the Court of Appeal—whether the release in this case is enforceable as to *any* form of negligence. After consideration of the briefing, however, we decline to address that issue.

vast majority of out-of-state cases and other authority, that an agreement made in the context of sports or recreational programs or services, purporting to release liability for future gross negligence, generally is unenforceable as a matter of public policy. Applying that general rule in the case now before us, we hold that the agreement, to the extent it purports to release liability for future gross negligence, violates public policy and is unenforceable.

I

The relevant facts were properly set forth by the Court of Appeal below, and we adopt that recitation with minor supplementation and stylistic changes.

The City has provided extensive summer recreational facilities and activities for children, including a camp for children with developmental disabilities[2]—Adventure Camp. Katie Janeway, who suffered from cerebral palsy, epilepsy, and other similar developmental disabilities, participated in Adventure Camp in 1999, 2000, 2001, and 2002.

Adventure Camp was conducted from noon until 5:00 p.m. on weekdays for approximately three weeks in July and August. Camp activities included swimming, arts and crafts, group games, sports, and field trips. In 2002, as in prior years, swimming activities were held on two of five camp days each week in a City swimming pool.

In 2002, the application form for Adventure Camp included a release of all claims against the City and its employees from liability, including liability based upon negligence, arising from camp activities.[3] Katie's mother, Maureen Janeway, signed the release. She had signed similar releases covering Katie's participation in the camp in prior years.

---

[2] The Lanterman Developmental Disabilities Services Act (Welf. & Inst. Code, § 4501 et seq.) defines "developmental disability" as "a disability that originates before an individual attains age 18 years, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual. As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include disabling conditions found to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation, but shall not include other handicapping conditions that are solely physical in nature." (*Id.*, § 4512, subd. (a).)

[3] The last section of the one-page form containing the release, signed in late June 2002, provided in relevant part (and in very small type): "CITY OF SANTA BARBARA RELEASE AGREEMENT[.] IN CONSIDERATION OF BEING PERMITTED TO PARTICIPATE IN THIS CITY ACTIVITY OR USE OF ANY CITY FACILITIES IN CONNECTION WITH THIS ACTIVITY, THE UNDERSIGNED AGREES TO THE FOLLOWING: [¶] 1. THE UNDERSIGNED HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS

Maureen Janeway disclosed Katie's developmental disabilities and medical problems to the City, specifically informing the City that Katie was prone to epileptic seizures, often occurring in water, and that Katie needed supervision while swimming. In addition, the City was aware that Katie had suffered seizures while attending Adventure Camp events in 2001. She had a seizure when sitting on the pool deck and another seizure at the skating rink. Paramedics were called after her seizure on the pool deck. Nevertheless, Maureen Janeway indicated that Katie was a good swimmer, and she never sought to prevent or restrict Katie's participation in the swimming portion of Adventure Camp.

Based upon the information provided by Maureen Janeway and Katie's history of seizures, the City took special precautions during the Adventure Camp swimming activities in 2002. The City assigned Veronica Malong to act as a "counselor." Malong's responsibility was to keep Katie under close observation during the camp's swimming sessions. Previously, Malong, a college student, had worked for one year as a special education aide at the middle school attended by Katie. Malong had observed Katie experience seizures at the school, and she received instruction from the school nurse regarding the handling of those seizures. Malong also attended training sessions conducted by the City concerning how to respond to seizures and other first aid matters.

NOT TO SUE THE CITY OF SANTA BARBARA, ITS EMPLOYEES, OFFICERS AND AGENTS (hereinafter referred to as 'releasees') from all liability to the undersigned, his or her personal representatives, assigns, heirs and next of kin for any loss, damage, or claim therefore on account of injury to the person or property of the undersigned, whether caused by any negligent act or omission of the releasees or otherwise while the undersigned is participating in the City activity or using any City facilities in connection with the activity. [¶] 2. THE UNDERSIGNED HEREBY AGREES TO INDEMNIFY AND HOLD HARMLESS the releasees from all liability, claims, demands, causes of action, charges, expenses, and attorney fees . . . resulting from involvement in this activity whether caused by any negligent act or omission of the releasees or otherwise. [¶] 3. THE UNDERSIGNED HEREBY ASSUMES FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE while upon City property or participating in the activity or using any City facilities and equipment whether caused by any negligent act or omission of releasees or otherwise. The undersigned expressly agrees that the foregoing release and waiver, indemnity agreement and assumption of risk are intended to be as broad and inclusive as permitted by California law . . . . [¶] I acknowledge that I have read the foregoing and that I am aware of the legal consequences of this agreement, including that it prevents me from suing the City or its employees, agents or officers if I am injured or damaged for any reason as a result of participation in this activity. . . . [¶] IF THE PARTICIPANT IS A MINOR, his or her custodial parent or legal guardian must read and execute this agreement. I hereby warrant that I am the legal guardian or custodial parent of _____ who is a minor, and agree, on my own and said minor's behalf to the terms and conditions of the foregoing agreement. [¶] Adult name (please print) . . . ." (Original capitalization.) Katie's mother printed and signed her name; the space for the minor's name was left blank, but Katie's name was written earlier, at the top of the form containing the release.

Katie participated in the first swimming day at the 2002 Adventure Camp without incident. On the second swimming day she drowned.

Approximately one hour before drowning, while waiting to enter the locker room at the pool, Katie suffered a mild seizure that lasted a few seconds. Malong observed the seizure and sent another counselor to report the incident to a supervisor. According to the pleadings, the supervisor stated that the report never was received. Malong watched Katie for approximately 45 minutes following the mild seizure. Then, receiving no word from her supervisor, Malong concluded that the seizure had run its course and that it was safe for Katie to swim.

Malong sat on the side of the pool near the lifeguard, watching the deep end of the pool. In addition to the Adventure Camp participants, there were as many as 300 other children in the pool area. Malong watched Katie jump off a diving board and swim back to the edge of the pool. At Malong's insistence, Katie got out of the pool and rested for a few minutes. Malong then asked Katie whether she wished to dive again, and Katie said she did. Katie dove into the water, bobbed to the surface, and began to swim toward the edge of the pool. As Katie did so, Malong momentarily turned her attention away from Katie. When Malong looked back no more than 15 seconds later, Katie had disappeared from her sight. After Malong and others looked for Katie somewhere between two and five minutes, an air horn blew and the pool was evacuated. Lifeguards pulled Katie from the bottom of the pool, and she died the next day.

Katie's parents, Terral and Maureen Janeway, filed a wrongful death action alleging the accident was caused by the negligence of the City and Malong. Relying upon the release, defendants moved unsuccessfully for summary judgment and summary adjudication. Defendants then sought relief in the Court of Appeal, filing a petition for writ of mandate. (Code Civ. Proc., § 437c, subd. (m)(1).) As noted earlier, the appellate court denied the petition, holding (1) the agreement was effective and enforceable insofar as it concerned defendants' liability for future ordinary negligence, but (2) concluding a release of liability for future gross negligence generally is unenforceable, and the agreement in this case did not validly release such liability. As observed above, we address only the second holding.

## II

### A

■ We begin by defining the terms that underlie the issue presented. "Ordinary negligence"—an unintentional tort—consists of a failure to exercise the degree of care in a given situation that a reasonable person under

similar circumstances would employ to protect others from harm. (See, e.g., *Donnelly v. Southern Pacific Co.* (1941) 18 Cal.2d 863, 869 [118 P.2d 465] (*Donnelly*).)

"Gross negligence" long has been defined in California and other jurisdictions as either a " ' "want of even scant care" ' " or " ' "an extreme departure from the ordinary standard of conduct." ' " (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1185–1186 [7 Cal.Rptr.3d 552, 80 P.3d 656] (*Eastburn*), and cases cited; accord, *Colich & Sons v. Pacific Bell* (1988) 198 Cal.App.3d 1225, 1240 [244 Cal.Rptr. 714] (*Colich*); *Kearl v. Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1052–1053 [236 Cal.Rptr. 526]; see also, e.g., Prosser & Keeton, The Law of Torts (5th ed. 1984) § 34, pp. 211–212 (Prosser and Keeton); 57A Am.Jur.2d (2004) Negligence, § 227, p. 296.)[4]

B

As observed in *Gardner v. Downtown Porsche Audi* (1986) 180 Cal.App.3d 713, 716 [225 Cal.Rptr. 757] (*Gardner*), "[t]raditionally the law has looked carefully and with some skepticism at those who attempt to contract away their legal liability for the commission of torts." Courts and commentators have observed that such releases pose a conflict between contract and tort law. On the one hand is the freedom of individuals to agree to limit their future liability; balanced against that are public policies underlying our tort system: as a general matter, we seek to maintain or reinforce a reasonable standard of care in community life and require wrongdoers—not the community at large—to provide appropriate recompense to injured parties.[5]

The traditional skepticism concerning agreements designed to release liability for future torts, reflected in *Gardner, supra,* 180 Cal.App.3d 713, and many other cases, long has been expressed in Civil Code section 1668

---

[4] By contrast, "wanton" or "reckless" misconduct (or " 'willful and wanton negligence' ") describes conduct by a person who may have no intent to cause harm, but who intentionally performs an act so unreasonable and dangerous that he or she knows or should know it is highly probable that harm will result. (*Donnelly, supra,* 18 Cal.2d 863, 869; see, e.g., Prosser & Keeton, *supra,* § 34, pp. 213–214.)

The definition of gross negligence set forth above is not universally followed; some jurisdictions define that term as tantamount to "wanton" or "reckless" misconduct. (Prosser & Keeton, *supra,* § 34, pp. 211–212; 57A Am.Jur.2d, *supra,* Negligence, § 232, p. 301; see also *post,* fn. 23.)

[5] See, e.g., *Heil Valley Ranch, Inc. v. Simkin* (Colo. 1989) 784 P.2d 781, 784 (releases of future tort liability "stand at the crossroads of two competing principles: freedom of contract and responsibility for damages caused by one's own negligent acts"); *Hanks v. Powder Ridge Restaurant Corp.* (2005) 276 Conn. 314 [885 A.2d 734, 742] (*Hanks*) ("exculpatory provisions undermine the policy considerations governing our tort system").

(hereafter cited as section 1668), which (unchanged since its adoption in 1872) provides: "All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his [or her] own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

C

In *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441] (*Tunkl*), we applied section 1668 in the context of a release required by a nonprofit research hospital as a condition of providing medical treatment. In that case, the plaintiff had signed a contract releasing the operators of the hospital—the Regents of the University of California— " 'from any and all liability' " for " 'negligent . . . acts or omissions of its employees' " so long as the hospital used due care in selecting those employees. (60 Cal.2d at p. 94.) Thereafter, the plaintiff sued for ordinary negligence based on the treatment received from two of the hospital's doctors.

Turning to section 1668, Justice Tobriner's unanimous opinion for the court noted that past decisions had differed concerning the reach of that statute (*Tunkl, supra*, 60 Cal.2d 92, 96–97), but that those decisions agreed in one significant respect: they consistently "held that [an agreement's] exculpatory provision may stand only if it does not involve [and impair] 'the public interest.' " (*Id.*, at p. 96.) Exploring the meaning and characteristics of the concept of "public interest" as illuminated by the prior cases (*id.*, at pp. 96–98), we read those precedents as recognizing a general rule that an *"exculpatory clause which affects the public interest cannot stand."* (*Id.*, at p. 98, italics added.)

*Tunkl* next addressed the "factors or characteristics" that underlie the concept of "public interest" in the context of an agreement releasing liability for future ordinary negligence. (*Tunkl, supra*, 60 Cal.2d 92, 98.) In passages widely quoted and followed or adopted as a guide by numerous out-of-state decisions addressing the enforceability of such agreements,[6] we wrote: "The

---

[6] For example, see *Hanks, supra*, 885 A.2d 734, 742–744; *Berlangieri v. Running Elk Corp.* (2003) 134 N.M. 341 [76 P.3d 1098, 1109–1113]; *Moore v. Hartley Motors, Inc.* (Alaska 2001) 36 P.3d 628, 631; *Dalury v. S-K-I, Ltd.* (1995) 164 Vt. 329 [670 A.2d 795, 797–799] (*Dalury*); *Kyriazis v. University of West Virginia* (1994) 192 W.Va. 60 [450 S.E.2d 649, 653–655] (*Kyriazis*); *Wagenblast v. Odessa School Dist.* (1988) 110 Wn.2d 845 [758 P.2d 968, 971–973] (*Wagenblast*); *Milligan v. Big Valley Corp.* (Wyo. 1988) 754 P.2d 1063, 1066–1067; *Krohnert v. Yacht Systems Hawaii, Inc.* (1983) 4 Haw.App. 190 [664 P.2d 738, 744]; *Jones v. Dressel* (Colo. 1981) 623 P.2d 370, 376–378; *Porubiansky v. Emory University* (1980) 156 Ga.App. 602 [275 S.E.2d 163, 167–169]; *Olson v. Molzen* (Tenn. 1977) 558 S.W.2d 429, 431.

social forces that have led to such characterization are volatile and dynamic. No definition of the concept of public interest can be contained within the four corners of a formula. The concept, always the subject of great debate, has ranged over the whole course of the common law; rather than attempt to prescribe its nature, we can only designate the situations in which it has been applied. We can determine whether the instant contract does or does not manifest the characteristics which have been held to stamp a contract as one affected with a public interest." (*Tunkl, supra,* 60 Cal.2d at p. 98.)

■ We found in the prior cases a "rough outline" of the "type of transaction in which exculpatory provisions will be held invalid," explaining: "[T]he attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Tunkl, supra,* 60 Cal.2d 92, 98–101, fns. omitted.)

■ We continued our analysis in *Tunkl* by stressing that considerations of public policy did not bar *all* contracts releasing future liability for negligence,[7] and by drawing a distinction between such permissible releases and those that implicate at least some of the circumstances described above. (*Tunkl, supra,* 60 Cal.2d 92, 101.) We commented that when certain of these characteristics are present, the transaction is such that "the releasing party does not really acquiesce voluntarily in the contractual shifting of the risk," and further that when the "service is one which each member of the public, presently or potentially, may find essential to him," the releasor "faces, despite his economic inability to do so, the prospect of a compulsory

---

[7] We observed: "[O]bviously no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party . . . ." (*Tunkl, supra,* 60 Cal.2d 92, 101.)

assumption of the risk of another's negligence." (*Id.*, at p. 101.)[8] Applying the public interest characteristics articulated above to the facts of the transaction then before us in *Tunkl*, we concluded that the release exhibited not only some of those characteristics, but all of them, and that the contract of exculpation for negligence committed by the hospital's employee doctors "affect[ing] the public interest" was invalid. (*Id.*, at pp. 101–102.)[9]

.

D

In subsequent decisions, California courts have invalidated releases of liability for future *ordinary* negligence under the analysis set forth in *Tunkl, supra*, 60 Cal.2d 92, when, guided by *Tunkl's* public interest discussion, the court determines that a particular release concerns a service that transcends a purely private agreement and affects the public interest. (E.g., *Henrioulle v. Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 517–520 [143 Cal.Rptr. 247, 573 P.2d 465] [release of liability for negligence by residential landlord]; *Gavin W. v. YMCA of Metropolitan Los Angeles* (2003) 106 Cal.App.4th 662 [131 Cal.Rptr.2d 168] [release of liability for negligence by provider of childcare services]; *Pelletier v. Alameda Yacht Harbor* (1986) 188 Cal.App.3d 1551 [230 Cal.Rptr. 253] [release of liability for negligence by provider of harbor boat berth]; *Gardner, supra*, 180 Cal.App.3d 713 [release of liability for negligence by auto repair shop]; *Vilner v. Crocker National Bank* (1979) 89 Cal.App.3d 732 [152 Cal.Rptr. 850] [release of liability for negligence relating to banking services]; *Akin v. Business Title Corp.* (1968) 264 Cal.App.2d 153 [70 Cal.Rptr. 287] [release of liability for negligence by escrow company]; see also *Health Net of California, Inc. v. Department of Health Services* (2003) 113 Cal.App.4th 224 [6 Cal.Rptr.3d 235] (*Health Net*)

---

[8] In this regard we also observed: "The public policy of this state has been, in substance, to posit the risk of negligence upon the actor; in instances in which this policy has been abandoned, it has generally been to allow or require that the risk shift to another party better or equally able to bear it, not to shift the risk to the weak bargainer." (*Tunkl, supra*, 60 Cal.2d at p. 101.)

[9] Commenting further on the concept of "public interest," we emphasized the public's concern with respect to some types of otherwise private agreements: "We must note, finally, that the integrated and specialized society of today, structured upon mutual dependency, cannot rigidly narrow the concept of the public interest. From the observance of simple standards of due care in the driving of a car to the performance of the high standards of hospital practice, the individual citizen must be completely dependent upon the responsibility of others. The fabric of this pattern is so closely woven that the snarling of a single thread affects the whole. We cannot lightly accept a sought immunity from careless failure to provide the hospital service upon which many must depend. Even if the hospital's doors are open only to those in a specialized category, the hospital cannot claim isolated immunity in the interdependent community of our time. It, too, is part of the social fabric, and prearranged exculpation from its negligence must partly rend the pattern and necessarily affect the public interest." (*Tunkl, supra*, 60 Cal.2d 92, 104.)

[exculpatory clause related to managed health care for Medi-Cal beneficiaries]; see generally 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 662–665, pp. 739–746 (Witkin).) Other jurisdictions have held similar releases in various analogous contexts to be unenforceable under a *Tunkl*-influenced analysis. (See, e.g., *Vodopest v. MacGregor* (1996) 128 Wn.2d 840 [913 P.2d 779, 783] (*Vodopest*) [invalidating, under Washington law, a release related to medical research]; *Wagenblast, supra,* 758 P.2d 968, 971–973 [invalidating, under Washington law, releases related to interscholastic public high school activities, including athletic teams and cheerleading].)

E

As the parties observe, no published California case has upheld, or voided, an agreement purporting to release liability for future *gross* negligence. Some decisions have stated, in dictum, that such a release is unenforceable. (*Farnham v. Superior Court* (1997) 60 Cal.App.4th 69, 74 [70 Cal.Rptr.2d 85] ["exemptions from *all* liability for . . . gross negligence . . . have been consistently invalidated"]; *Health Net, supra,* 113 Cal.App.4th 224, 234 [liability for future gross negligence cannot be released].) Others carefully have specified that liability for "ordinary" or "simple" negligence generally may be released (that is, so long as doing so is consistent with *Tunkl, supra,* 60 Cal.2d 92)—thereby implicitly differentiating gross negligence from the class of conduct as to which liability generally may be released.[10] Indeed, for more than three decades, Witkin has asserted that California law categorically bars the prior release of liability for future gross negligence: "The present view is that a contract exempting from liability for ordinary negligence is valid where no public interest is involved . . . . [¶] *But there can be no exemption from liability for* intentional wrong [or] *gross negligence . . . .*" (1 Witkin, *supra,* Contracts, § 660, pp. 737–738, italics added; see also 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 631, p. 569 [same]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 485, pp. 411–412 [essentially identical]; 1 Witkin, Summary of Cal. Law (7th ed. 1960) Contracts, § 200, p. 226 ["The Contracts Restatement declares that a person can contract to exempt himself from liability for ordinary negligence, but not for gross negligence"].) As defendants observe, however, Witkin does not cite any relevant California decision in support of that proposition.

---

[10] See *Buchan v. United States Cycling Federation, Inc.* (1991) 227 Cal.App.3d 134, 150 [277 Cal.Rptr. 887] (*Buchan*) (generally, contracts that " 'seek to exempt one from liability for simple negligence' " are valid); *Madison v. Superior Court* (1988) 203 Cal.App.3d 589, 599 [250 Cal.Rptr. 299] (*Madison*) (same); *Hulsey v. Elsinore Parachute Center* (1985) 168 Cal.App.3d 333, 342 [214 Cal.Rptr. 194] (*Hulsey*) (§ 1668 "does not invalidate contracts which seek to except one from liability for simple negligence" [italics omitted]).

On the other hand, as defendants and their amici curiae[11] also observe, a number of cases have upheld agreements insofar as they release liability for future *ordinary* negligence in the context of sports and recreation programs, on the basis that such agreements do not concern necessary services, and hence do not transcend the realm of purely private matters and implicate the "public interest" under *Tunkl, supra*, 60 Cal.2d 92. Our lower courts have upheld releases of liability concerning ordinary negligence related to gymnasiums and fitness clubs,[12] auto and motorcycle racing events,[13] ski resorts and ski equipment,[14] bicycle races,[15] skydiving or flying in "ultra light" aircraft,[16] and various other recreational activities and programs such as horseback riding, white-water rafting, hypnotism, and scuba diving.[17] Most, but not all, other jurisdictions have held similarly.[18] In light of these decisions, some

---

[11] Amici curiae supporting defendants are: (1) the National Association of Stock Car Racing, Inc. (NASCAR), and the California Speedway Corporation; (2) Bally Total Fitness Corporation and 24 Hour Fitness USA, Inc.; (3) the Sierra Club; (4) the League of California Cities and the California State Association of Counties; and (5) the International Health, Racquet, and Sportsclub Association and the California Clubs of Distinction.

[12] See *Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351 [129 Cal.Rptr.2d 197] (*Benedek*); *Lund v. Bally's Aerobic Plus, Inc.* (2000) 78 Cal.App.4th 733 [93 Cal.Rptr.2d 169]; *Sanchez v. Bally's Total Fitness Corp.* (1998) 68 Cal.App.4th 62 [79 Cal.Rptr.2d 902]; *Leon v. Family Fitness Center (#107), Inc.* (1998) 61 Cal.App.4th 1227 [71 Cal.Rptr.2d 923]; *YMCA of Metropolitan Los Angeles v. Superior Court* (1997) 55 Cal.App.4th 22 [63 Cal.Rptr.2d 612] (*YMCA*); *Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158 [21 Cal.Rptr.2d 245].

[13] See *Allabach v. Santa Clara County Fair Assn.* (1996) 46 Cal.App.4th 1007 [54 Cal.Rptr.2d 330] (*Allabach*); *National & Internat. Brotherhood of Street Racers, Inc. v. Superior Court* (1989) 215 Cal.App.3d 934 [264 Cal.Rptr. 44]; *Kurashige v. Indian Dunes, Inc.* (1988) 200 Cal.App.3d 606 [246 Cal.Rptr. 310]; *Coates v. Newhall Land & Farming, Inc.* (1987) 191 Cal.App.3d 1 [236 Cal.Rptr. 181]; *Hoffman v. Sports Car Club of America* (1986) 180 Cal.App.3d 119 [225 Cal.Rptr. 359]; *McAtee v. Newhall Land & Farming Co.* (1985) 169 Cal.App.3d 1031 [216 Cal.Rptr. 465].

[14] See *Platzer v. Mammoth Mountain Ski Area* (2002) 104 Cal.App.4th 1253 [128 Cal.Rptr.2d 885] (*Platzer*); *Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354 [114 Cal.Rptr.2d 265]; *Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358 [59 Cal.Rptr.2d 813]; *Olsen v. Breeze, Inc.* (1996) 48 Cal.App.4th 608 [55 Cal.Rptr.2d 818]; *Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715 [22 Cal.Rptr.2d 781].

[15] See *Buchan, supra*, 227 Cal.App.3d 134; *Bennett v. United States Cycling Federation* (1987) 193 Cal.App.3d 1485 [239 Cal.Rptr. 55]; *Okura v. United States Cycling Federation* (1986) 186 Cal.App.3d 1462 [231 Cal.Rptr. 429].

[16] See *Paralift, Inc. v. Superior Court* (1993) 23 Cal.App.4th 748 [29 Cal.Rptr.2d 177]; *Powers v. Superior Court* (1987) 196 Cal.App.3d 318 [242 Cal.Rptr. 55]; *Hulsey, supra*, 168 Cal.App.3d 333.

[17] See *Guido v. Koopman* (1991) 1 Cal.App.4th 837 [2 Cal.Rptr.2d 437] (horseback riding); *Saenz v. Whitewater Voyages, Inc.* (1991) 226 Cal.App.3d 758 [276 Cal.Rptr. 672] (*Saenz*) (white-water rafting); *Hohe v. San Diego Unified Sch. Dist.* (1990) 224 Cal.App.3d 1559 [274 Cal.Rptr. 647] (*Hohe*) (hypnotism demonstration); *Madison, supra*, 203 Cal.App.3d 589 (scuba diving).

[18] See, e.g., cases cited in *Vodopest, supra*, 913 P.2d 779, 783–784; *Hanks, supra*, 885 A.2d 734, 752–753 and footnote 5 (dis. opn. of Norcott, J.); Arango and Trueba, Jr., *The Sports*

more recent appellate decisions have concluded categorically that private agreements made "in the recreational sports context" releasing liability for future ordinary negligence "do not implicate the public interest and therefore are not void as against public policy." (*Benedek, supra*, 104 Cal.App.4th at pp. 1356–1357.)

## III

In the absence of an authoritative discussion in any California opinion concerning the enforceability of an agreement releasing liability for future *gross* negligence, we consider the law of other jurisdictions. We find that the vast majority of decisions state or hold that such agreements generally are void on the ground that public policy precludes enforcement of a release that would shelter *aggravated misconduct*. (See, e.g., *Xu v. Gay* (2003) 257 Mich.App. 263 [668 N.W.2d 166, 170] (*Xu*); *Zavras v. Capeway Rovers Motorcycle Club* (1997) 44 Mass.App.Ct. 17 [687 N.E.2d 1263, 1265] (*Zavras*); *Wolf v. Ford* (1994) 335 Md. 525 [644 A.2d 522, 525]; *New Light Co. v. Wells Fargo Alarm Servs.* (1994) 247 Neb. 57 [525 N.W.2d 25, 29–31] (*New Light*); *Wheelock v. Sport Kites, Inc.* (D. Hawaii 1993) 839 F.Supp. 730, 736 (*Wheelock*) [applying Hawaii law]; *Boyce v. West* (1993) 71 Wn.App. 657 [862 P.2d 592, 597] (*Boyce*); *Sommer v. Federal Signal Corp.* (1992) 79 N.Y.2d 540 [593 N.E.2d 1365, 1370–1371, 583 N.Y.S.2d 957]; *Buckner v. Varner* (Tenn.Ct.App. 1990) 793 S.W.2d 939, 941; *Wade v. Watson* (N.D.Ga. 1981) 527 F.Supp. 1049, 1051–1052 [applying Ga. law]; *Shelby Mut. Ins. v. Grand Rapids* (1967) 6 Mich.App. 95 [148 N.W.2d 260, 262].)

## A

The text writers reflect this majority rule. For example, in Champion, Fundamentals of Sports Law (1990), the author observes: "[I]t is universally held that *a release will not bar a claim for gross negligence. That is true even though the same exculpatory clause would bar an [action] for simple negligence.*" (*Id.*, § 11.2, p. 209, italics added; see also *id.*, § 11.6, p. 215.) Leading treatises are in accord; indeed, some of them state categorically that any attempt to release liability for future gross negligence is void as against public policy.[19] Yet other treatise writers and law review authors have offered

*Chamber: Exculpatory Agreements Under Pressure* (1997) 14 U. Miami Ent. & Sports L.Rev. 1, 10-16 (Arango and Trueba); 57A American Jurisprudence Second (2004) Negligence, section 65, pages 135–136; but see cases cited *post*, part IV.C.2.b.

[19] See 6A Corbin on Contracts (1962) section 1472, pages 596–597 ("It is generally held that those who are not engaged in public service may properly bargain against liability for harm caused by their ordinary negligence in performance of a contractual duty; but *such an exemption is always invalid if it applies to harm* wilfully inflicted or *caused by gross* or wanton *negligence*" [italics added, fn. omitted]); 15 Corbin on Contracts (rev. ed. 2003) section

similar, albeit slightly moderated characterizations of the law,[20] reflecting the circumstance that there are at least a handful of cases from a few jurisdictions that, without discussing the general rule or authorities set forth above, enforce contracts releasing liability for future gross negligence in the context of agreements signed by motor vehicle racing participants.[21]

85.18, page 455 ("The general rule of exculpatory agreements is that a party may agree to exempt another party from tort liability if that tort liability results from ordinary negligence. *Courts do not enforce agreements to exempt parties from tort liability if the liability results from that party's own gross negligence,* recklessness, or intentional conduct" [italics added]); 8 Williston on Contracts (4th ed. 1998) section 19:23, pages 291–292 ("*An attempted exemption from liability for a future* intentional tort or crime, or for a future willful or *grossly negligent act is generally held void . . .*" [italics added, fns. omitted]); see also Lindahl, 2 Modern Tort Law (2002) section 22:2, page 22-2 ("It is well settled that *one may not by contract exculpate himself or herself from liability for* willful and wanton conduct or *gross negligence*" [italics added, fns. omitted]); 57A American Jurisprudence Second, *supra,* Negligence, section 58, pages 127–128 ("It has been held that *a person may not exonerate himself or herself from liability* for intentional torts, for willful or wanton misconduct, or *for gross negligence by the use of exculpatory language; such a provision is void as against public policy.* Thus, to the extent that agreements purport to grant exemption for liability for willful or grossly negligent acts, they are wholly void, and *an injured party may recover for acts of gross negligence despite a valid release for negligence*" [italics added, fns. omitted]).

[20] For example, see 1A Speiser et al., The American Law of Torts (2003) section 5:39, pages 540–541 ("The courts are pretty well agreed that by use of exculpatory language, one may not exonerate himself of liability for intentional tort, for wilful or wanton misconduct, or for gross negligence"); Connell and Savage, *Releases: Is There Still a Place for Their Use by Colleges and Universities?* (2003) 29 J. C.&U. L. 579, 603 ("Courts generally agree that one may not exonerate himself or herself from liability for willful or wanton misconduct, for gross negligence, or for intentional torts, even if there is broad exculpatory language"); Nelson, *The Theory of the Waiver Scale: An Argument Why Parents Should Be Able to Waive Their Children's Tort Liability Claims* (2002) 36 U.S.F. L.Rev. 535, 552 (Nelson) (regarding purported releases of liability for gross negligence or recklessness, "courts generally agree that the heightened public policy interests in dissuading such conduct outweigh the individual right to contract," and "[m]ost states . . . prohibit waivers from releasing claims for gross negligence or anything else rising above 'garden variety' negligence"); King, *Exculpatory Agreements for Volunteers in Youth Activities—The Alternative to "Nerf®" Tiddlywinks* (1992) 53 Ohio St. L.J. 683, 728 (King) ("a majority of courts . . . hold that exculpatory agreements are unenforceable if defendant's conduct constituted gross negligence"); see also Arango and Trueba, *supra,* 14 U. Miami Ent. & Sports L.Rev. 1, 13 (noting that recreational releases attempting to exculpate for gross negligence have been voided on public policy grounds); Holcomb, *The Validity and Effectiveness of Pre-injury Releases of Gross Negligence in Texas* (1998) 50 Baylor L.Rev. 233, 241; Springer, *Releases: An Added Measure of Protection from Liability* (1987) 39 Baylor L.Rev. 487, 502–503.

[21] See *Maness v. Santa Fe Park Enterprises, Inc.* (1998) 298 Ill.App.3d 1014 [700 N.E.2d 194, 196–199, 233 Ill.Dec. 93] (enforcing agreement releasing liability for "negligence or gross negligence," and declining to recognize a tort claim for "outrageous misconduct"); *Theis v. J & J Racing Promotions* (Fla.Dist.Ct.App. 1990) 571 So.2d 92, 94 (release of liability for "negligence" "must be construed as intended to encompass all forms of negligence, simple or gross"); *Barnes v. N.H. Karting Assoc.* (1986) 128 N.H. 102 [509 A.2d 151, 155] (enforcing

B

The reasoning of the foregoing out-of-state decisions holding that liability for future gross negligence never can, or generally cannot, be released, is based upon a public policy analysis that is different from the "public interest" factors considered under *Tunkl, supra*, 60 Cal.2d 92. *Tunkl*'s public interest analysis focuses upon the overall transaction—with special emphasis upon the importance of the underlying service or program, and the relative bargaining relationship of the parties—in order to determine whether an agreement releasing future liability for *ordinary* negligence is unenforceable. By contrast, the out-of-state cases cited and alluded to above, declining to enforce an agreement to release liability for future gross negligence, focus instead upon the degree or extent of the misconduct at issue, as well as the "public policy to discourage" (or at least not facilitate) "aggravated wrongs." (Prosser & Keeton, *supra*, § 68, p. 484.) Those cases hold, in essence, that an agreement that would remove a party's obligation to adhere to even a minimal standard of care, thereby sheltering aggravated misconduct, is unenforceable as against public policy. (E.g., *New Light, supra*, 525 N.W.2d 25, 29–31; *Zavras, supra*, 687 N.E.2d 1263, 1265; *Wheelock, supra*, 839 F.Supp. 730, 736.)

IV

Defendants and their supporting amici curiae argue that we should not be guided by these out-of-state cases and authorities, for three reasons. They assert that (1) enforcement of agreements releasing liability for future gross negligence is mandated by section 1668, and a contrary rule would violate both that statute and the holding in *Tunkl, supra*, 60 Cal.2d 92; (2) many out-of-state decisions supporting the proposition that future gross negligence cannot be released are distinguishable and hence inapt; and (3) considerations of public policy, properly understood, mandate not the majority rule— generally *voiding* releases of liability for future gross negligence—but the opposite, that is, a rule *enforcing* releases of liability for future gross negligence.

---

release of liability for "negligence," and declining to "create" a cause of action for gross negligence); *Valeo v. Pocono Intern. Raceway, Inc.* (1985) 347 Pa.Super. 230 [500 A.2d 492, 493] (release for "negligence" also releases for gross negligence).

Two other decisions, both concerning burglar alarm services, uphold a release as to gross negligence, but allow suit to proceed on other grounds. (See *Tessler and Son, Inc. v. Sonitrol Sec. Systems* (App.Div. 1985) 203 N.J. Super. 477 [497 A.2d 530, 533] [release of liability for "negligence" also released gross negligence "in the circumstances of this case"; the court allowed the action to proceed on a theory of "wanton misconduct"—that is, recklessness]; *L. Luria & Son, Inc. v. Honeywell, Inc.* (Fla.Dist.Ct.App. 1984) 460 So.2d 521 [release of liability for "negligence" and limitation of damages also releases liability for gross negligence; court allowed the matter to proceed on a fraud theory].)

A

1

Defendants and some of their supporting amici curiae observe that section 1668, which as noted *ante*, part II.B, bars enforcement of agreements releasing one from responsibility for his or her "own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent," does not list gross negligence as one of the types of liability that may not be released. They contrast section 1668's language with section 2175 of the Civil Code (also enacted in 1872), which specifies that common carriers may not enforce releases of liability for future gross negligence. Defendants and their amici curiae argue that section 1668 thus represents an implied legislative determination to *allow* releases of liability for gross negligence, as long as the release does not affect the public interest under the principles of *Tunkl, supra*, 60 Cal.2d 92; and they assert section 1668 precludes courts from voiding releases on any public policy basis not set forth in that statute.

In this respect we agree with the Court of Appeal below, which observed that section 1668 "has not been . . . interpreted to authorize any and all releases that are not expressly invalidated." As the lower court also noted, "*Tunkl* itself went beyond the language of Civil Code section 1668 to invalidate releases of liability for negligence under certain circumstances . . . ." To be more explicit: our unanimous decision in *Tunkl, supra*, 60 Cal.2d 92, did precisely what defendants and their supporting amici curiae assert is precluded by section 1668—our decision found a release of liability for future ordinary negligence void on public policy grounds *other than those set forth in section 1668*. Indeed, *Tunkl* sets forth a categorical rule: Any exculpatory clause (even one releasing liability for future ordinary negligence) is unenforceable if it relates to a transaction that adequately exhibits at least some of the six characteristics set forth in that case, and thereby "affects the public interest." We could not accept the statutory argument advanced by defendants and their supporting amici curiae, without at the same time fundamentally undermining and effectively overruling *Tunkl*—and we decline any implied invitation to do so.[22] Accordingly, we reject defendants' argument that, by enacting section 1668 more than 130 years ago, our Legislature

---

[22] In this regard, the analysis proposed in Justice Kennard's concurring and dissenting opinion, *post*, appears problematic and internally inconsistent. That opinion argues, *post*, in part II, that because section 1668 does not list gross negligence as a matter that may not be released, a court-made rule embracing the clear majority approach and generally invalidating releases of liability for gross negligence usurps the Legislature's authority. Justice Baxter's dissenting opinion, *post*, embraces this view as well. But as noted above, *Tunkl* itself sets forth a similarly categorical rule: Pursuant to *Tunkl*, no exculpatory clause (even one releasing liability for future ordinary negligence) that relates to a transaction adequately exhibiting at

established a policy generally *allowing* releases of liability for future gross negligence, and hence a policy precluding this court from adopting, on public policy grounds, the opposite—and clearly majority—rule.

2

We also reject the similar argument, advanced by defendants and their amici curiae, that we may not recognize or employ, as a basis for invalidating a release, any public policy rationale different from that set out in our decision in *Tunkl, supra,* 60 Cal.2d 92.

As we have observed *ante,* in part III.B, the out-of-state decisions and other authority holding agreements releasing liability for future gross negligence to be unenforceable are based, not on *Tunkl*'s public interest, "transaction-focused" analysis, but instead upon a separate and different public policy rationale focusing upon the degree or extent of the misconduct at issue, in order to discourage (or at least not facilitate) aggravated wrongs. Defendants and their amici curiae, however, assert that if a particular agreement releasing liability for "negligence" is, as the Court of Appeal found in the present case, enforceable under the *Tunkl* public interest analysis (an issue that, as observed *ante,* fn. 1, we do not address), then, also pursuant to *Tunkl,* such an agreement "can and should be enforced for *all* negligence"—that is, ordinary *and* gross negligence. Justice Baxter, in his dissenting opinion in this matter, *post,* embraces the same view.

We did not address in *Tunkl* whether an agreement purporting to release liability for future gross negligence could be enforced; we considered only the circumstances in which a release of liability for the type of negligence at issue in that case—future *ordinary* negligence—might be unenforceable. Our recognition in *Tunkl* that the concept of "public interest" is dynamic, not static; our refusal to rigidly "prescribe its nature"; and our explication of only a "rough outline" of the type of transaction as to which a release of liability for *ordinary* negligence would be unenforceable (*Tunkl, supra,* 60 Cal.2d at p. 98), all belie the suggestion that we now should read *Tunkl* as implicitly foreclosing a different public policy analysis in the context of an agreement purporting to release liability for future gross negligence. Certainly, nothing in *Tunkl* is inconsistent with the public-policy-based majority rule described

least some of the six characteristics set forth in that case, and that thereby "affects the public interest" (*Tunkl, supra,* 60 Cal.2d 92, 98) is enforceable. Accordingly, if the statutory construction analysis employed by Justice Kennard's concurring and dissenting opinion were consistently applied, *Tunkl* itself would be viewed as a usurpation of legislative authority. And yet neither of the separate opinions in this case adopts that view. Indeed, Justice Kennard's concurring and dissenting opinion, *post,* in part III, far from questioning *Tunkl,* embraces and extends it in a novel manner.

above. Nor can *Tunkl* reasonably be read to stand for the proposition that, assuming *Tunkl*'s public interest factors do not preclude enforcement of an agreement releasing liability for future *ordinary* negligence, this same agreement also should, or even may, be construed and enforced to release liability for future *gross* negligence.

## B

Defendants contend that many out-of-state decisions supporting the proposition that liability for future gross negligence cannot be released arise in jurisdictions that define this form of negligence not as California does (as either (1) a failure to exercise even slight care, or (2) an extreme departure from the ordinary standard of conduct—see *ante*, pt. II.A), but instead define that term as conduct tantamount to wanton, reckless, or willful misconduct.[23] Even if some decisions arguably are distinguishable on that basis, however, significant other out-of-state authority is not so readily distinguishable.

For example, the State of Washington, which views gross negligence consistent with the California definition, has long held void and unenforceable any attempted release of liability for a negligent act that "falls *greatly below* the standard established by law for protection of others." (*Vodopest, supra*, 913 P.2d 779, 783, italics added.)[24] The same approach appears to apply in Massachusetts, which also long has viewed gross negligence consistent with the California definition. (See *Zavras, supra*, 687 N.E.2d 1263, 1265–1266 & fn. 4 [noting general rule that liability for "ordinary" negligence may be released, but that liability for "gross" negligence—defined as the " 'absence of slight diligence, or the want of even scant care' "—may not]; see also *Sharon v. City of Newton* (2002) 437 Mass. 99 [769 N.E.2d 738, 748, fn. 12] (*Sharon*) [citing *Zavras* with approval].) Similarly, Nebraska, which also long has viewed gross negligence consistent with the California definition, has refused to permit the release of liability for such future conduct. (*New Light, supra*, 525 N.W.2d 25, 30–31 [defendant barred from insulating itself for damages caused by its own gross negligence, defined as

---

[23] See, e.g., *Xu, supra*, 668 N.W.2d 166, 169–170; see generally 57A American Jurisprudence Second, *supra*, Negligence, section 59, page 128 (asserting that in the context of reviewing contractual releases of liability, gross negligence is viewed as tantamount to recklessness—but citing for that proposition only one New York decision, *Lubell v. Samson Moving & Storage, Inc.* (App.Div. 2003) 307 A.D.2d 215 [763 N.Y.S.2d 30, 31–32]).

[24] See also *Scott v. Pacific West Mt. Resort* (1992) 119 Wn.2d 484 [834 P.2d 6, 10] (*Scott*); *McCutcheon v. United Homes Corp.* (1971) 79 Wn.2d 443 [486 P.2d 1093, 1095] (tracing this rule to the Rest., Contracts, § 574, com. a, p. 1080, which in turn defines "gross negligence" as "conduct falling greatly below" "the standard established by law for the protection of others against unreasonable risk of harm"); see generally *Boyce, supra*, 862 P.2d 592, 597, and cases cited (exculpation agreement releases liability for "ordinary," but not "gross," negligence—and leaves the plaintiff free to allege and establish an action for gross negligence).

failure to employ even "slight care" in the performance of its duty].) In other words, it appears that these states—and Washington in particular, for many decades—have enforced what is effectively the same rule that defendants and their amici curiae assert should be rejected as unwarranted and unworkable in California.

## C

Ultimately, defendants and their amici curiae argue that rejection of the majority rule described above, and adoption of the opposite rule proposed by them, is mandated by public policy, as they perceive it. They stress the asserted uncertainty of the gross negligence standard and argue that unless providers of recreational services and related programs can be assured that agreements purporting to release liability for future gross negligence will be enforced, (1) subsequent suits against recreational service providers—private, public, for-profit, or nonprofit—will not be readily resolvable in favor of defendants on summary judgment, with the result that unwarranted liability will be threatened or imposed, and (2) service providers will react by greatly restricting, or simply declining to afford, such services or programs in California.

## 1

We do not agree that adoption of the foregoing majority rule in the setting of the definition of "gross negligence" employed in this state (failure to exercise even slight care, or an extreme departure from the ordinary standard of conduct) would prove unworkable, or that application of such a standard would frustrate the proper termination of suits on summary judgment or foster untoward liability. As the parties acknowledge, the same definition long has been employed in cases applying numerous California *statutes* that confer limited immunity for negligence while expressly exempting immunity for gross negligence.[25] Despite the concerns of defendants and their amici curiae, in light of the experience under these statutes it does not appear that the application of a gross negligence standard, as defined in California, has a tendency to impair the summary judgment process or confuse juries and lead to judgments erroneously imposing liability. To the contrary: "These statutes reflect the sound legislative judgment that, under a gross negligence standard, meritless suits will typically be disposed of by summary judgment; that when

---

[25] For example, see Civil Code section 2175 (granting qualified immunity for common carriers); Government Code section 831.7, subdivision (b) (qualified immunity of public entity or employee for hazardous recreational activity on public property); Civil Code section 1714.2, subdivision (b) (qualified immunity of person rendering cardiopulmonary resuscitation at emergency scene); Business and Professions Code section 2727.5 (qualified immunity of registered nurse rendering care at scene of emergency but outside scope of employment).

a case goes to trial the jury, instructed on this standard, will be less likely to confuse injury with fault; and that verdicts reflecting such confusion will be more readily reversed, whether by the trial or appellate court, than under an ordinary negligence standard." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1020 [4 Cal.Rptr.3d 103, 75 P.3d 30] (conc. opn. of Werdegar, J.).)[26] In this respect, we emphasize the importance of maintaining a distinction between ordinary and gross negligence, and of granting summary judgment on the basis of that distinction in appropriate circumstances. (See *Decker v. City of Imperial Beach* (1989) 209 Cal.App.3d 349, 358 [257 Cal.Rptr. 356] ["Generally it is a triable issue of fact whether there has been such a lack of care as to constitute gross negligence"—"but not always"]; see also, e.g., *Eastburn, supra,* 31 Cal.4th 1175, 1185–1186 [trial court properly precluded amendment of a complaint to allege gross negligence]; *DeVito v. State of California* (1988) 202 Cal.App.3d 264, 272 [248 Cal.Rptr. 330] [summarily concluding that a complaint "alleges no facts showing 'an extreme departure from the ordinary standard of care' "].)

2

As defendants observe, some cases and other authorities assert, albeit without citing any empirical evidence, that upholding agreements releasing liability for future negligence is necessary in order to ensure the continued availability of sports recreation and related programs. (E.g., *Hohe, supra,* 224 Cal.App.3d 1559, 1564; *YMCA, supra,* 55 Cal.App.4th 22, 27–28.)[27] Defendants and their amici curiae embrace this broad premise and argue by analogy

---

[26] The Court of Appeal below similarly rejected "the view that gross negligence lacks clear limits," observing: "The law is filled with difficult distinctions, yet our juries have managed to fulfill their role in making factual determinations based on them. There is no reason to believe that a jury will be unable to distinguish between ordinary and gross negligence, or that instructing the jury would be more difficult than instructing the jury in a variety of other circumstances where lines between liability and nonliability must be drawn with some acumen. (See *Pratt v. Western Pac. R. R. Co.* (1963) 213 Cal.App.2d 573, 579–580 [29 Cal.Rptr. 108] [consider[ing] jury instruction under statute preventing common carrier from releasing liability for gross negligence].)"

[27] See also, e.g., *Allabach, supra,* 46 Cal.App.4th 1007, 1016 (asserting that, with regard to properly released negligence claims, " '[d]efense costs are devastating' " and that " '[u]nless courts are willing to dismiss such actions without trial, many popular and lawful recreational activities are destined for extinction' "); see generally *Sharon, supra,* 769 N.E.2d 738, 747–748; *Zivich v. Mentor Soccer Club* (1998) 82 Ohio St. 3d 367, 371–372 [696 N.E.2d 201] (*Zivich*); King, *supra,* 53 Ohio St. L.J. 683, 689 (reporting survey results from 1986 and asserting that "fear of liability exposure and of litigation in general is damaging . . . efforts at volunteer recruitment"); Judges, *Of Rocks and Hard Places: The Value of Risk Choice* (1993) 42 Emory L.J. 1, 29–34 (reporting anecdotal information from the late 1980's and early 1990's, and limited empirical evidence revealing that the rock climbing industry and related service providers are "deeply concerned about the issue of tort law and its impact on risk choice"); Heidt, *The Avid Sportsman and the Scope for Self-Protection: When Exculpatory Clauses*

that the same principle applies with respect to agreements releasing liability for future gross negligence.

Defendants assert that unless recreation service providers dependably can enforce agreements to release liability for *both* future ordinary negligence and future gross negligence, "the inevitable result will be fewer—and more expensive—programs," and that (quoting *Allabach, supra,* 46 Cal.App.4th 1007, 1016) ultimately, " ' "many popular and lawful recreational activities are destined for extinction." ' "

The various amici curiae in support of defendants echo and amplify these predictions. For example, amici curiae NASCAR and the California Speedway Association assert that limiting agreements releasing liability for future ordinary negligence, while not permitting the release of liability for future gross negligence, ultimately will "deprive [the public] of the . . . opportunity to participate and recreate in many . . . cherished [pastimes]," including being spectators at NASCAR and similar motor vehicle racing events. Likewise, amici curiae Bally Total Fitness Corporation and 24 Hour Fitness USA, Inc., claim the appellate decision below, enforcing the release as to negligence but not as to gross negligence, "[wreaks] havoc on recreational providers," leading them to a "precipice from which there will be no return." Similarly, the brief of the International Health, Racquet, and Sportsclub Association and California Clubs of Distinction twice declares that "the effect of [enforcing a

---

*Should Be Enforced* (2004) 38 U. Rich. L.Rev. 381, 382 (Heidt) (recounting anecdotal reports of decreased availability of opportunities in various jurisdictions to use three-meter diving boards, ride mechanized bulls or horses unaccompanied, or rent power boats for water-skiing); see also Arango and Trueba, *supra,* 14 U. Miami Ent. & Sports L.Rev. 1, 30–33 (questioning whether certain recreation industries can "surviv[e]" unless agreements releasing liability for future negligence are upheld); Roseman-Orr, *Recreational Activity Liability in Hawai'i: Are Waivers Worth the Paper on Which They Are Written?* (1999) 21 U. Haw. L.Rev. 715, 729 and footnote 114 (noting legislative testimony of charter service provider that lawsuits will " 'end up running our business out of business' "); Benard, *Little League Fun, Big League Liability* (1997) 8 Marq. Sports L.J. 93, 122 (noting the "perception" of the threat of liability exposure and statements made at congressional hearings supporting the Volunteer Protection Act of 1997, 42 U.S.C. § 14501 et seq. [which grants immunity for negligence that causes injury to volunteers, but not for gross negligence; see *id.,* § 14503(a)(3)]); but see Popper, *A One-term Tort Reform Tale: Victimizing the Vulnerable* (1998) 35 Harv. J. on Legis. 123, 146 (asserting that only anecdotes, and no empirical evidence, were offered to support the Volunteer Protection Act: "Beyond the rhetoric and natural inclination to assist charities, virtually no facts were placed before Congress to justify the deprivation of the entitlement to due care"); Heidt, *supra,* 38 U. Rich. L.Rev. 381, 434 ("Given the multitude of explanations for why an activity disappears—from changing consumer tastes, to the appearance of substitute activities—no explanation can be put forth with confidence. As others have emphasized, even industry experts may not be able to distinguish when an activity is abandoned due to consumer preference from when it is abandoned due to increased liability"); Nelson, *supra,* 36 U.S.F. L.Rev. 535, 555 (as of 2002, "doomsday predictions of runaway liability for recreational sports leagues" have not been borne out in practice).

release as to negligence but not as to gross negligence] cannot be over-stated"—and suggests that unless releases of liability for future gross negligence are enforced, there will be "far reaching and devastating consequences," rendering commercial health and racquet clubs "a thing of the past." Amici curiae Sierra Club, League of California Cities, and California State Association of Counties make similar, albeit slightly less strident, assertions.

We are sensitive to the policy arguments advanced by defendants and their amici curiae that caution against rules triggering wholesale elimination of beneficial recreational programs and services—and we are especially sensitive to the concerns relating to the continued availability of programs such as the one here at issue, serving the recreational needs of developmentally disabled children. But we find no support for such broad predictions in the present setting.

a

Although, as noted, some cases and authorities assert that upholding releases of liability for *ordinary* negligence may help ensure the continuation of sports recreation and related programs (see *ante*, at fn. 27), we do not discern in those cases any discussion of an asserted corresponding need to recognize and enforce agreements releasing liability for future *gross* negligence,[28] and indeed we find little supporting that position even in the law review literature upon which defendants rely.[29] We also find it significant that, as observed *ante*, part IV.B, the States of Washington, Massachusetts,

---

[28] In fact, some cases have been careful to distinguish between ordinary and gross negligence in this context. For example, when, in order to help ensure the continued availability of recreational services, the Supreme Judicial Court of Massachusetts, in *Sharon, supra*, 769 N.E.2d 738, enforced agreements by parents releasing " 'any and all actions, causes of action, [and] claims' " (*id.*, at p. 741) of minor children, the court stressed that its holding "is . . . limited to the claims before us—and those claims concern ordinary negligence." (*Id.*, at p. 748, fn. 12.) The court in *Sharon* further noted, with apparent approval, that cases and authorities have held releases "effective against liability for ordinary negligence" but not for "gross negligence," and the court observed that the defendant in the case before it "specifically disavows any contention that the release here would relieve it from liability for gross negligence . . . ." (*Ibid.*)

[29] Defendants cite two law review articles arguing, contrary to the clear majority rule, that gross negligence and even *recklessness* should be subject to exculpation. (See Heidt, *supra*, 38 U. Rich. L.Rev. 381, 383 [asserting that courts should enforce such contracts and "routinely dismiss" related suits on summary judgment "without the need for further discovery of the circumstances surrounding the injury"]; King, *supra*, 53 Ohio St. L.J. 683, 728–731 [questioning the "wisdom" of declining to enforce releases for "recklessness or gross negligence" because, assertedly, "[t]hese concepts lack clear parameters," and arguing that, "especially . . . in situations involving volunteers, when the danger of risky behavior motivated by greed is absent," exculpation of liability for gross negligence should be allowed].)

and Nebraska all effectively bar release of liability for gross negligence, as that term is defined in California. We would expect that if, based upon the experience of these sister states, there existed substantial evidence supporting the ominous forecasts of defendants and their amici curiae concerning the future of recreational services in California under the same system, defendants and their amici curiae would highlight that information. And yet, no such information has been provided to us.

b

Indeed, if the premise of defendants and their amici curiae were correct—that is, if failing to enforce agreements releasing liability for future *gross* negligence would imperil the very existence of sports and recreational industries—we at least would expect to see some analogous evidence in the experience of those states that prohibit even agreements releasing liability for future *ordinary* negligence. Ordinary negligence, after all, occurs much more commonly than gross negligence, and hence judicial decisions holding unenforceable any release of liability for ordinary negligence would, under the theory of defendants and their amici curiae, pose a much greater threat to the continued availability of recreational sports programs than would a rule holding unenforceable releases of liability for gross negligence generally. And yet, as explained below, in numerous contexts concerning recreational sports and related programs, courts categorically have voided agreements releasing liability for future ordinary negligence without (so far as we can discern) triggering in any substantial degree the dramatically negative effects predicted by defendants and their amici curiae.

Many thousands of contracts that have been entered into, releasing liability for future *ordinary* negligence in the context of recreational sports and related programs, are *unenforceable* in *most* states. This is so because, although courts in California[30] and a few other states[31] have enforced agreements,

---

[30] See *Hohe, supra,* 224 Cal.App.3d 1559, 1565 (summarily finding enforceable a release signed by parent on behalf of high school student later injured in a hypnosis demonstration); *Aaris v. Las Virgenes Unified School Dist.* (1998) 64 Cal.App.4th 1112, 1120 [75 Cal.Rptr.2d 801] (enforcing release signed by mother on behalf of high school cheerleader injured during practice, and asserting: "It is well established that a parent may execute a release on behalf of his or her child"); see also *Platzer, supra,* 104 Cal.App.4th 1253 (enforcing skiing-related release signed by parent on behalf of eight year old; decision assumes without discussion that a parent may execute a release on behalf of his or her child).

[31] Decisions by the high courts of Massachusetts and Ohio, citing policy considerations, have enforced releases signed by parents on behalf of their minor children: (See *Sharon, supra,* 769 N.E.2d 738, 744–748; *Zivich, supra,* 696 N.E.2d 201, 204–207.) Moreover, a Colorado Supreme Court decision declining to enforce such releases, *Cooper v. Aspen Skiing Co.* (Colo. 2002) 48 P.3d 1229, 1232–1237, has been abrogated by state legislation. (Colo. Rev. Stat. § 13-22-107, subds. (3) & (4) [allowing parents to release minor child's future claim of ordinary negligence, but not any claim for a "willful and wanton act or omission, a reckless act or omission, or a grossly negligent act or omission"].)

signed by parents, releasing liability for future ordinary negligence committed against minor children in recreational and related settings, that position apparently represents a minority view. "A clear majority of courts . . . have held that a parent may not release a minor's prospective claim for negligence." (*Hawkins ex rel. Hawkins v. Peart* (2001) 2001 UT 94 [37 P.3d 1062, 1065–1066] [voiding agreement signed on behalf of minor releasing liability for future negligence concerning horseback riding], and cases and other authorities cited.)[32]

In addition, we observe that Vermont has voided agreements releasing liability for future ordinary negligence in the context of recreational skiing and racing;[33] Connecticut has acted similarly concerning "snow tubing" and horseback riding lessons;[34] West Virginia has voided a release of liability for ordinary negligence executed by a university student who was injured while playing "club" rugby;[35] and Washington has voided agreements releasing public school districts from liability for future ordinary negligence related to interscholastic athletics.[36] Virginia long has categorically and broadly voided *all* preinjury releases, even in the recreational sports context.[37] Perhaps most

---

[32] Accord, *Hojnowski v. Vans Skate Park* (App.Div. 2005) 375 N.J. Super. 568 [868 A.2d 1087, 1096–1101] (*Hojnowski*), and cases and other authorities cited (skateboarding); *Scott, supra*, 834 P.2d 6, 10–12 (ski race lesson), and cases cited; 67A Corpus Juris Secundum (2002) Parent and Child, sections 275 and 276, pages 381–383; see also Nelson, *supra*, 36 U.S.F. L.Rev. 535; King, *supra*, 53 Ohio St. L.J. 683, 714–715, 759 (noting, and recommending legislative abrogation of, the majority rule).

Plaintiffs and real parties in interest have not raised this issue in the present wrongful death action, apparently because the agreement in this case (see *ante*, fn. 3) clearly was addressed not only to claims by a minor, but as well to claims by *parents*. (See *Scott, supra*, 834 P.2d 6, 12 [even though a parent's release may not bar a minor's claim, a "conspicuous and clear exculpatory clause can serve to bar the parents' cause of action based upon injury to their child"].) The validity of a release signed by a parent, on behalf of (and binding) his or her child, is not presently before us.

[33] *Dalury, supra*, 670 A.2d 795, 797–799 (barring agreements insofar as they broadly purport to release liability for future negligence related to course design in the context of recreational skiing; court declined to "undermine the public policy underlying business invitee law and allow skiers to bear risks they have no ability or right to control"); *Spencer v. Killington, Ltd.* (Vt. 1997) 702 A.2d 35, 37–38 (confirming and extending *Dalury* in context of amateur ski race); see also *Umali v. Mount Snow Ltd.* (D.Vt. 2003) 247 F.Supp.2d 567, 572–575 (applying *Dalury* to a professional mountain bike race).

[34] *Hanks, supra*, 885 A.2d 734, 741–748 (following the lead of *Dalury*, broadly voiding agreements releasing liability for future negligence related to commercial "snow tubing"); *Reardon v. Windswept Farm, LLC* (2006) 280 Conn. 153 [905 A.2d 1156, 1160–1162] (voiding release related to injuries sustained by an experienced horseback rider when thrown by an excited and bucking horse during a riding lesson).

[35] *Kyriazis, supra*, 450 S.E.2d 649, 653–655.

[36] *Wagenblast, supra*, 758 P.2d 968, 971–973.

[37] *Hiett v. Lake Barcroft Community Assoc.* (1992) 244 Va. 191 [418 S.E.2d 894, 895–897] (*Hiett*) (adhering to the rule followed in that state since 1890, "universally" declining to

significantly, the New York Legislature, for three decades, has barred enforcement of agreements between operators of "gymnasium[s]" and places of "amusement or recreation, or similar establishment[s]," and their paying members or customers, purporting to release liability for future negligence by the operator. (N.Y. Gen. Obl. Law, § 5-326.)[38] Pursuant to this statute, New York courts have found releases to be void and unenforceable in the context of suits for personal injuries caused by ordinary negligence related to automobile racing at commercial racetracks;[39] skiing and ski lessons at resorts;[40] horseback riding organized and operated by a business firm or riding stable business;[41] recreational parachuting or skydiving lessons;[42] flag

---

enforce *any* preinjury release, and voiding a release signed by a triathlete later seriously injured in the swimming portion of a race).

[38] That statute, enacted in 1976, provides: "Every covenant, agreement or understanding in or in connection with, or collateral to, any contract, membership application, ticket of admission or similar writing, entered into between the owner or operator of any pool, gymnasium, place of amusement or recreation, or similar establishment and the user of such facilities, pursuant to which such owner or operator receives a fee or other compensation for the use of such facilities, which exempts the said owner or operator from liability for damages caused by or resulting from the negligence of the owner, operator or person in charge of such establishment, or their agents, servants or employees, shall be deemed to be void as against public policy and wholly unenforceable." (See generally Seaquist & Barken, *Use of Exculpatory Clauses Is Subject to Wide Variety of Definitions and Circumstances* (Mar./Apr. 2002) 74 N.Y.St. B.J. 27, 28 [discussing the evolving case law, some of which is described in the text and fns., *post*, as "expand[ing] the consumer protection afforded by the statute"].)

As explained in *Beardslee v. Blomberg* (App.Div. 1979) 70 A.D.2d 732 [416 N.Y.S.2d 855, 857–858] (conc. opns. of Kane & Mikoll, JJ.), the New York statute was enacted in part to abrogate the New York high court's decision in *Ciofalo v. Vic Tanney Gyms* (1961) 10 N.Y.2d 294 [177 N.E.2d 925, 220 N.Y.S.2d 962]. In that case, a gymnasium member signed a release of liability for negligence by the gym operator, and later was injured when she slipped and fell while using the gym's facilities. Affirming summary judgment for the defendant gym, the New York court upheld the release, finding no "interest of the public therein" and no reason to void the agreement. (*Id.*, at p. 926.)

[39] See *Owen v. R.J.S. Safety Equipment, Inc.* (1992) 79 N.Y.2d 967 [591 N.E.2d 1184, 582 N.Y.S.2d 998]; *Petrie v. Bridgehampton Road Races Corp.* (App.Div. 1998) 248 A.D.2d 605 [670 N.Y.S.2d 504]; *Gilkeson v. Five Mile Point Speedway* (App.Div. 1996) 232 A.D.2d 960 [648 N.Y.S.2d 844]; *Miranda v. Hampton Auto Raceway, Inc.* (App.Div. 1987) 130 A.D.2d 558 [515 N.Y.S.2d 291]; *Gaskey v. Vollertsen* (App.Div. 1985) 110 A.D.2d 1066 [488 N.Y.S.2d 922].

[40] See *Rogowicki v. Troser Management, Inc.* (App.Div. 1995) 212 A.D.2d 1035 [623 N.Y.S.2d 47]; *Blanc v. Windham Mountain* (Sup.Ct. 1982) 115 Misc.2d 404 [454 N.Y.S.2d 383], affirmed (App.Div. 1983) 92 A.D.2d 529 [459 N.Y.S.2d 447].

[41] See *Applbaum ex rel. Applbaum v. Golden Acres Farm and Ranch* (N.D.N.Y. 2004) 333 F.Supp.2d 31; *Filson v. Cold River Trail Rides, Inc.* (App.Div. 1997) 242 A.D.2d 775 [661 N.Y.S.2d 841]; *Brancati v. Bar-U-Farm, Inc.* (App.Div. 1992) 183 A.D.2d 1027 [583 N.Y.S.2d 660].

[42] See *Wurzer v. Seneca Sport Parachute Club* (App.Div. 1978) 66 A.D.2d 1002 [411 N.Y.S.2d 763]; *Bacchiocchi v. Ranch Parachute Club, Ltd.* (App.Div. 2000) 273 A.D.2d 173 [710 N.Y.S.2d 54].

football played in a league run by a corporation;[43] tennis played at a country club at which the plaintiff was a member;[44] and riding a "mechanical bull" in a bar.[45]

We brought the cases from these six states (Connecticut, Utah, Vermont, Virginia, Washington, and West Virginia) and the New York statute to the parties' attention and solicited supplemental briefing concerning defendants' policy argument that enforcing releases of liability for future ordinary negligence, but not for future gross negligence, would lead to the demise or substantially diminished availability of recreational services and programs. Thereafter, pursuant to a request by defendants, we allowed additional supplemental briefing. The ensuing briefing, however, disclosed no empirical study suggesting that holdings such as those described above, precluding the release of liability for future ordinary negligence (or for that matter, similar holdings under *Tunkl, supra,* 60 Cal.2d 92),[46] have triggered the predicted elimination or even widespread substantial reduction of the affected services or programs. Indeed, defendants forthrightly concede in their supplemental briefs that they found no empirical support for such assertions.

Defendants caution, however, against any attempt to assess " 'the societal effects of judicial holdings' " (quoting Choper, *Consequences of Supreme Court Decisions Upholding Individual Constitutional Rights* (1984) 83 Mich. L.Rev. 1, 7), and they suggest that because of legal, economic, social and other differences between the seven jurisdictions discussed above and California, the experiences of those states "probably" are not predictive of what might occur in California if we were to decline to enforce releases of liability for future gross negligence. Nevertheless, and seemingly in conflict with their own admonition about attempting to assess the societal effects of judicial holdings, defendants speculate that the rules employed in the seven jurisdictions described above, declining to enforce releases of liability for future *ordinary* negligence, "*may* have led or *may* lead to the diminished availability or even the demise of recreational services and programs" in those states. Furthermore, defendants suggest that, even without empirical

---

[43] See *Williams v. City of Albany* (App.Div. 2000) 271 A.D.2d 855 [706 N.Y.S.2d 240].

[44] See *Leftow v. Kutsher's Country Club Corp.* (App.Div. 2000) 270 A.D.2d 233 [705 N.Y.S.2d 380].

[45] *Meier v. Ma-Do Bars, Inc.* (App.Div. 1985) 106 A.D.2d 143 [484 N.Y.S.2d 719].

[46] As observed *ante,* part II.D, pursuant to *Tunkl, supra,* 60 Cal.2d 92, California courts long have voided agreements releasing liability for future ordinary negligence in the context of such socially important matters as medical services, auto repair, banking, and day care—and courts of our sister states have rendered similar applications of our decision in *Tunkl* in analogous contexts.

evidence of any negative effects in those states, but in light of some law review articles generally predicting such effects if releases of liability for future ordinary negligence are not enforced (see *ante*, fn. 27), we should *assume* such effects have occurred and will occur in those jurisdictions, and that such effects also would occur in California, were we to adopt a rule posing even a comparatively *lesser* threat to the continued availability of recreational sports and sports programs—that is, a rule generally enforcing releases of liability for future *ordinary* negligence, but generally declining to enforce releases of liability for future *gross* negligence.

We find defendants' arguments unpersuasive. Of course legal, economic, social, and other differences can make interjurisdictional comparisons inexact. But that does not mean we should ignore what might be gleaned from the legal laboratory that is the product of our federal system, under which states may, and do, undertake different solutions to common problems.[47] The circumstance that neither defendants nor their supporting amici curiae have found from the experience of our sister states any substantial empirical evidence supporting their dire predictions is, we believe, both relevant and telling.

Indeed, it appears that the experience of our sister states has not borne out the predictions of defendants and their supporting amici curiae. In Virginia and New York, for example—where, as noted above, agreements to release future liability for *ordinary* negligence causing personal injury long have been categorically barred by case law or generally precluded by statute, as construed by case law—service providers have been subjected to the potential of liability substantially greater than that facing their counterparts in California and most other jurisdictions, which (as observed *ante*, part II.E) generally uphold such releases. And yet, our research suggests that the predicted demise of recreational opportunities apparently has not come to pass in Virginia or New York.

For example, amicus curiae NASCAR's brief predicts the downfall of spectator auto racing unless agreements releasing liability for future gross negligence regularly are enforced. According to NASCAR's official Web site, however, of the 31 NASCAR-affiliated major speedways located in the United States and Mexico, two are, and long have been, located in Virginia, and one is, and long has been, located in New York.[48] In other words, despite

---

[47] (Cf. *New State Ice Co. v. Liebmann* (1932) 285 U.S. 262, 311 [76 L.Ed. 747, 52 S.Ct. 371] (dis. opn. of Brandeis, J.) ["It is one of the happy incidents of the federal system" that single states may "serve as a laboratory" and undertake "novel social and economic experiments"].)

[48] See <http://www.nascar.com/races/tracks/index.html> (as of July 16, 2007) (listing all 31 tracks); <http://www.nascar.com/races/tracks/rir/> (as of July 16, 2007) (Richmond International Raceway, Richmond, Va.); <http://www.nascar.com/races/tracks/mar/> (as of July

Virginia's and New York's strict "no release of liability for ordinary negligence" rules, which subject NASCAR to greater potential liability than the mere "no release of liability for gross negligence" rule at issue in the present case, NASCAR-sponsored racing appears not to have disappeared in those states.

Likewise, amicus curiae Bally Total Fitness Corporation's prediction of calamity in the health club industry if releases of liability for future gross negligence are not enforced appears difficult to reconcile with the prevalence of that corporation's business in those two states. Bally's official Web site discloses that it operates seven clubs in Virginia, and 36 in New York.[49] Amici curiae International Health, Racquet, and Sportsclub Association and California Clubs of Distinction similarly assert that commercial recreational services are in danger of extinction if releases of liability for future gross negligence are not enforced. According to the 2002 United States Economic Census (Aug. 2005), which reports on, among other things, each state's "fitness and recreational sports center[s]" (including health, fitness, swimming, racquet, and handball clubs, as well as roller skating and ice-skating rinks), in 2002 there were more than 750 such business locations in Virginia, and more than 1,800 in New York.[50] Again, despite the strict Virginia and New York rules, which subject recreational service providers to far greater potential liability than the mere "no release of liability for gross negligence" rule at issue in the present case, it does not appear that commercial and organized recreational clubs have become "a thing of the past" in those states.[51]

Nor are we aware of any empirical evidence to suggest, as defendants postulate, that a holding declining to enforce an agreement purporting to release liability for future gross negligence would jeopardize programs, such

---

16, 2007) (Martinsville Speedway, Martinsville, Va.); <http://www.nascar.com/races/tracks/wgi/> (as of July 16, 2007) (Watkins Glen International, Watkins Glen, N.Y.).

[49] See <http://bally.know-where.com/BallyFitness2/> (as of July 16, 2007), entries for Virginia and New York.

[50] See United States Census Bureau (2002) Business and Government, Economic Fact Sheet, entries for Virginia and New York <http://factfinder.census.gov/home/saff/main.html> (as of July 16, 2007).

[51] The same appears to be true concerning nonprofit sporting events. For example, as plaintiffs observe, 14 years after the Virginia Supreme Court in *Hiett, supra*, 418 S.E.2d 894, voided an agreement releasing liability for future ordinary negligence relating to participation in a triathlon, at least 60 triathlons, biathlons, and duathlons were held in Virginia in 2006, and at least that many have been scheduled for 2007. (See <http://www.trifind.com/va.html> [as of July 16, 2007].)

as the one here at issue, that provide recreational opportunities for developmentally disabled children—and indeed, initial research casts doubt upon such predictions.[52]

We reject the arguments of defendants and their amici curiae that considerations of public policy mandate the adoption of a rule under which agreements releasing liability for future gross negligence always, or even generally, would be enforced.

## V

■   As then-Justice Traynor observed in *Donnelly, supra*, 18 Cal.2d 863, the distinction between "ordinary and gross negligence" reflects "a rule of policy" that harsher legal consequences should flow when negligence is aggravated instead of merely ordinary. (*Id.*, at p. 871; accord, e.g., *Colich, supra*, 198 Cal.App.3d 1225, 1240.)

■   For the reasons discussed above—that is, adherence to the "public policy to discourage," or at least not facilitate, "aggravated wrongs" (Prosser & Keeton, *supra*, § 68, p. 484)—and consistent with *Donnelly, supra*, 18 Cal.2d 863, and the Court of Appeal below, as well as the vast majority of

---

[52] At our request, our court's reference librarians conducted a search for presently operating camps or programs similar to the one at issue in this case (that is, programs offering recreational activities for developmentally disabled children) in four states: California, Utah, Virginia, and Washington. As observed above, pursuant to case law in the latter three states, no release—even one purporting to release liability only for future *ordinary*, and not gross, negligence—would be enforceable in the context of a recreational camp or program for developmentally disabled children. If, as postulated, the unenforceability of releases for *gross* negligence would be expected to trigger limitation or curtailment of such camps or programs, we would expect to see such a result all the more in those jurisdictions that refuse to enforce even releases of liability for ordinary negligence. And yet initial information collected suggests no such result, even in jurisdictions that refuse to enforce releases of liability for ordinary negligence: Our reference staff identified 92 such camps or programs presently operating in California, six in Utah, 21 in Virginia, and 16 in Washington. Based upon 2000 and 2006 United States census figures, it is possible to estimate, for each state, the number of persons ages five to 15 years who have a mental disability. (U.S. Census Bur. (2003) Disability Status: 2000 <http://www.census.gov/prod/2003pubs/c2kbr-17.pdf> [as of July 16, 2007]; U.S. Census Bur., State & County QuickFacts <http://quickfacts.census.gov/qfd/states/> [as of July 16, 2007].) From that, it appears that in each state, such camps or programs are provided at a very similar camp-to-population ratio: The ratio for California is one camp or program per approximately 18,000 persons who have a mental disability; approximate figures for the other states are: Utah, one per 19,500; Washington, one per 18,000; and Virginia, one per 16,500. Although of course we do not view this empirical information as dispositive, we note that it fails to provide any support for the assertions articulated by defendants or their supporting amici curiae, or the concerns expressed by Justice Baxter, in his dissenting opinion, *post*, that finding the release in this case unenforceable as to *gross negligence* would be likely to cause programs such as the one here to be severely limited or cancelled.

other jurisdictions, we conclude that public policy generally precludes enforcement of an agreement that would remove an obligation to adhere to even a *minimal* standard of care.[53] Applying that general rule here, we hold that an agreement purporting to release liability for future gross negligence committed against a developmentally disabled child who participates in a recreational camp designed for the needs of such children violates public policy and is unenforceable.[54]

The Legislature, which already has enacted numerous statutes designed to protect from unfair liability various participants in and sponsors of socially useful enterprises (see *ante*, fn. 25), is of course free to enact additional legislation limiting, as necessary, the liability of specific recreational service providers.[55] If those who provide such programs or other recreational sports

---

[53] Accord, *Tunkl, supra*, 60 Cal.2d at pages 101 and 104 (quoted *ante*, fns. 8 & 9). It is well established that our courts, like those of other states, may, in appropriate circumstances, void contracts on the basis of public policy. Of course, "[t]he determination of public policy of states resides, first, with the people as expressed in their Constitution and, second, with the representatives of the people—the state Legislature." (*Jensen v. Traders & General Ins. Co.* (1959) 52 Cal.2d 786, 794 [345 P.2d 1].) As we explained in *Jensen*, " 'unless it is entirely plain that a contract is violative of sound public policy, a court will never so declare. "The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and . . . should be exercised only in cases free from doubt." ' " (*Id.*, at p. 794; see also, e.g., *Maryland C. Co. v. Fidelity etc. Co.* (1925) 71 Cal.App. 492, 497 [236 P. 210] [in appropriate circumstances "courts, following the spirit and genius of the law . . . of a state, may declare void as against public policy contracts which, though not in terms specifically forbidden by legislation, are clearly injurious to the interests of society"]; *Tunstall v. Wells* (2006) 144 Cal.App.4th 554, 564 [50 Cal.Rptr.3d 468] [reiterating and applying *Maryland Casualty Co.*, in concluding that a will's no contest clause did not violate public policy], and cases cited; 14 Cal.Jur.3d (1999) Contracts, § 136, pp. 425–427.)

[54] Justice Kennard's concurring and dissenting opinion, *post*, reaches the same result under what appears to be a novel modified version of the six-part *Tunkl* analysis. No other court of which we are aware has followed that suggested course. As observed above, the majority rule that we embrace today does not rely upon the *Tunkl* factors, but instead simply holds that an agreement purporting to relieve an actor of liability for aggravated misconduct generally is unenforceable as being against public policy. We adopt the rule followed by the overwhelming majority of jurisdictions, together with its public-policy-based rationale.

[55] See, for example, *Hojnowski, supra*, 868 A.2d 1087, in which the New Jersey appellate court, adhering to the majority rule, declined to enforce a skateboard park's release of liability for negligence, signed by a parent on behalf of a minor. The court, citing statutes designed to protect various specific types of sports programs (such as skiing, tobogganing, sledding, roller skating, and equestrian activities), observed that if skateboard parks "will be faced with economic extinction as the result of this decision, then the Legislature can be apprised of that fact and can act, as it has to protect other industries that it deemed to be both important and threatened." (*Id.*, at pp. 1099–1100; see generally McCaskey & Biedzynski, *A Guide to the Legal Liability of Coaches for a Sports Participant's Injuries* (1996) 6 Seton Hall J. Sport L. 7, 62–63 [citing various state statutes granting immunity to coaches for negligence, but not for gross negligence or recklessness]; Arango & Trueba, *supra*, 14 U. Miami Ent. & Sports L.Rev. 1, 31–32 [noting qualified immunity provisions enacted in some states concerning various recreational sports and programs].)

services believe the viability of their particular industry rests upon the ability to secure valid releases of liability for future gross negligence—that is, exoneration for the providers' failure to employ even "slight care," or for an "extreme departure" from the ordinary standard of conduct—the proper forum in which to present that policy argument, and to seek that broad protection, is the Legislature.

## VI

Defendants and some of their supporting amici curiae assert that by declining to enforce the release at issue in this case against a possible claim for gross negligence, we would be (1) recognizing a legal distinction between ordinary negligence and more aggravated misconduct, and thus (2) in essence recognizing, in these circumstances, the possibility of a "cause of action" for gross negligence.[56] They assert we may not properly do either. As explained, we reject defendants' objections.

## A

Defendants claim our courts "may not distinguish ordinary from gross negligence absent express legislative authorization." In support of this proposition, they cite the Legislature's 1874 repeal of statutes recognizing and defining "slight," "ordinary," and "gross" negligence. (See *Walther v. Southern Pacific Co.* (1911) 159 Cal. 769, 775 [116 P. 51].) Amicus curiae NASCAR echoes this view, asserting that, with respect to gross negligence and "other grades" of misconduct such as recklessness and willful misconduct, California "courts have uniformly agreed that none of [those classifications], in the absence of specific statutory creation, are to be treated differently [from] 'ordinary' negligence" and that "there is no legal distinction" between the concepts of ordinary negligence, gross negligence, and recklessness "in the absence of a statute."

This assertion inaccurately characterizes the law. For example—and *despite* the absence of any statutory authorization for the distinction—we long have adhered to the common law rule that a contract may be reformed due to mutual mistake based upon "ordinary negligence," but not when the mistake is based upon "gross negligence." (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 529 [117 Cal.Rptr.2d 220, 41 P.3d 46]; see also *Van Meter v. Bent Construction Co.* (1956) 46 Cal.2d 588, 594–595 [297 P.2d 644] [allowing reformation upon a showing of gross negligence].)

---

[56] Whether sufficient facts exist in this case to allow the matter to proceed to trial on a theory of gross negligence is a separate question. As observed *post*, at footnote 61, the Court of Appeal concluded that there is sufficient evidence, but we do not address that determination.

Similarly, prior to abandonment of the common law doctrine of contributory negligence in favor of comparative fault in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226] (*Li*)—and despite the absence of any statutory authorization for making the distinction—recklessness by a tortfeasor long was recognized by California courts in order to ameliorate the harsh effects to a plaintiff of the contributory negligence bar. (See, e.g., 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 668, pp. 2974–2976, and cases cited.) Now, in the post-*Li* context, the common law doctrine of assumption of risk continues to disprove the thesis that absent statutory authority, the courts are precluded from drawing legal distinctions between ordinary negligence and more aggravated categories of misconduct. The primary-assumption-of-risk doctrine involves injury-causing conduct by a defendant who, because of the setting and the relationship of the parties, owes no legal duty to protect a plaintiff against ordinary negligence. (*Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*).)[57] In the context of active sports coparticipants, for example, this means that a defendant generally has no duty to eliminate, or protect a plaintiff against, risks inherent in a sport—that is, against ordinary careless conduct considered to be part of the sport. (*Id.,* at pp. 315–316.) And yet, *Knight* holds, such a defendant nevertheless may be liable for conduct "so *reckless* as to be totally outside the range of the ordinary activity." (*Id.,* at pp. 320–321, italics added.)

As shown, pursuant to our common law contract-reformation case law and the assumption-of-risk doctrine, and despite the absence of statutory authorization, California case law clearly distinguishes between the concepts of ordinary negligence and other, aggravated forms of misconduct such as gross negligence and recklessness.

B

Defendants and various supporting amici curiae also assert that California does not recognize any cause of action for "gross negligence" unless such an action is directly, or at least implicitly, authorized by one of the numerous statutes that employ gross negligence as the applicable standard. (See, e.g., statutes cited *ante,* fn. 25.) Defendants and their amici curiae rely upon *Continental Ins. Co. v. American Protection Industries* (1987) 197 Cal.App.3d 322 [242 Cal.Rptr. 784] (*Continental*).

We do not view our holding—that an agreement purporting to release liability for future gross negligence committed against a developmentally

---

[57] Our decision in *Knight* explains that an express agreement releasing future liability for negligence, such as we consider in the present case, similarly can "be viewed as analogous to primary assumption of risk." (*Knight, supra,* 3 Cal.4th at pp. 308–309, fn. 4.)

disabled child who participates in a recreational camp designed for the needs of such children violates public policy and is unenforceable—as recognizing a cause of action for gross negligence.[58] In any event, as explained below, the decision in *Continental* does not assist defendants.

*Continental, supra,* 197 Cal.App.3d 322, did not concern a release of future tort liability, but instead a liquidated damages provision of a contract for burglar alarm services. The provision limited damages for " 'negligence' " to $250 (*id.,* at p. 328, fn. 4), and the plaintiff, an insurer, sought unsuccessfully to avoid that clause by amending its complaint to allege not ordinary negligence, but gross negligence. In affirming the trial court's order refusing to recognize the plaintiff's cause of action, the appellate court noted that numerous California decisions had discussed and applied the doctrine of gross negligence in the context of various statutory provisions establishing that specific level of negligence as the operative standard in particular situations (*id.,* at p. 329, fn. 5). The appellate court in *Continental* also quoted Prosser and Keeton's comments concerning the " 'difficulty of drawing satisfactory lines of demarcation' " relating to degrees of negligence, and the ensuing elimination of the distinction between ordinary and gross negligence " '*in most situations.*' " (*Id.,* at p. 330, fn. 7, quoting Prosser & Keeton, *supra,* § 34, p. 211, italics added.) The court then observed that after the decision in *Li, supra,* 13 Cal.3d 804, which as noted abandoned the all-or-nothing common law doctrine of contributory negligence in favor of comparative fault, "the need for categorization of misconduct into degrees has been radically *diminished.*" (*Continental, supra,* 197 Cal.App.3d at p. 330, italics added.) From this, the court in *Continental* jumped to the broad conclusion that "*any* attempt to categorize gross negligence separately from ordinary negligence is *unnecessary*" (*ibid.,* italics added)—and it determined that the trial court properly had declined to allow the plaintiff to amend its complaint to allege gross negligence. (*Ibid.*) Subsequently, two decisions have, in offhand dicta, cited *Continental* as standing for the general proposition that "California does not recognize a distinct cause of action for 'gross negligence' independent of a statutory basis." (*Saenz, supra,* 226 Cal.App.3d 758, 766, fn. 9.)[59]

---

[58] Our holding simply imposes a limitation on the defense that is provided by a release. A plaintiff is not required to anticipate such a defense (see 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 381, p. 481); instead, the defendant bears the burden of raising the defense and establishing the validity of a release as applied to the case at hand. (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶ 6.436, p. 6-115.) In the present case, defendants' inability to establish the validity of the release as it relates to gross negligence means that, in any subsequent jury trial, defendants would not be entitled to instructions absolving them of liability for damages resulting from gross negligence. But this, we believe, is different from recognizing a separate cause of action for gross negligence.

[59] See also *Ordway v. Superior Court* (1988) 198 Cal.App.3d 98, 108, footnote 5 [243 Cal.Rptr. 536], disapproved on other grounds in *Knight, supra,* 3 Cal.4th 296, 306–309.

We need not address here the question whether the court in *Continental* reached the correct decision in the context of the liquidated damages provision before it.[60] We conclude, however, that the decision in *Continental* is distinguishable in the context of the release at issue in the present case. It is true that, after *Li*, in the context of comparative fault analysis, there typically is no need to distinguish gross negligence from ordinary negligence, because we now permit fact finders to compare the respective fault of the parties, regardless of the degree of negligence of each. (*Sorensen v. Allred* (1980) 112 Cal.App.3d 717, 725–726 [169 Cal.Rptr. 441] [allowing comparison of negligent and "willful and wanton" (reckless) conduct].) It also is generally true that, with the advent of comparative fault, the need to categorize misconduct into degrees has been "diminished." (*Continental, supra,* 197 Cal.App.3d 322, 330.) But as acknowledged by the court in *Continental, Li*'s adoption of comparative fault obviated the need for the distinction only in "most" situations—not in *all*. (197 Cal.App.3d at p. 330, fn. 7; accord, *Bielski v. Schulze* (1962) 16 Wis.2d 1 [114 N.W.2d 105, 114] [observing that the adoption of comparative fault, and the abrogation of gross negligence as a general matter, nevertheless may require that the law continue to recognize gross negligence in the context of "anticipatory releases and exculpatory clauses"].)

Again, reference to *Knight, supra,* 3 Cal.4th 296, is illustrative. As noted above, in the context of primary assumption of risk (that is, liability of active sports coparticipants for injuries arising from the normal conduct of the sport), the absence of a duty to protect against ordinary negligence does not absolve a defendant from liability based upon reckless conduct. Similarly, in the present situation, it cannot be said that a legal distinction between ordinary negligence and gross negligence is "unnecessary"—indeed, a theory of gross negligence, if supported by evidence showing the existence of a triable issue, is the *only* negligence-based theory that is potentially open to plaintiffs.[61]

## VII

The judgment of the Court of Appeal is affirmed.

Werdegar, J., Chin, J., and Corrigan, J., concurred.

---

[60] But see the decision filed two years after *Continental* in *Liberty Furniture v. Sonitrol* (1989) 53 Wn.App. 879 [770 P.2d 1086, 1087–1088] (essentially identical clause in burglar alarm contract limiting liquidated damages to $250 did not preclude an action based upon gross negligence).

[61] The Court of Appeal determined that the record supports the conclusion that there exists a material triable issue regarding gross negligence. We did not grant review of that issue and thus do not address it here.

**KENNARD, J.,** Concurring and Dissenting.—I agree with the majority that the contractual release of liability at issue in this case is unenforceable as to gross negligence, but I reach that conclusion for reasons that differ from the majority's. The majority relies largely on decisions from other jurisdictions to support a conclusion that releases for gross negligence are *inherently* and *generally* against public policy and unenforceable, but that conclusion cannot be reconciled with Civil Code sections 1668 and 2175, as I will explain. In my view, a contractual release of liability for gross negligence, like a contractual release of liability for ordinary negligence, must be examined in its *specific context* to determine whether it is against public policy. In performing that *contextual* public policy analysis, I rely on the factors that this court identified in *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441] (*Tunkl*).

**I**

The City of Santa Barbara (the City) runs a summer camp, called Adventure Camp, for children with developmental disabilities. Katie Janeway, who suffered from epilepsy, mild cerebral palsy, and other disabilities, started going to the camp in 1999, and she returned every summer until her death in 2002 at the age of 14. The City's application form for the camp required the child's parents to release the City and its employees from all liability for any loss or damage on account of injury "whether caused by any negligent act or omission of the releasees or otherwise." Katie's mother signed the year 2002 application form containing the release provision.

Katie's mother told the City's employees that Katie had seizures and needed supervision while swimming. The City assigned camp counselor Veronica Malong, a college student, to supervise Katie during swimming activities. About an hour before she drowned, Katie had a mild seizure. Malong waited until Katie appeared to be fully recovered before allowing her to swim. There were about 300 children in and around the large, Olympic-size swimming pool, which was staffed with five lifeguards. Katie wanted to use the diving board. That area of the pool was roped off so only one child would be in the water at a time. Katie dove once without problem. After a 10-minute rest, Katie dove a second time. Malong saw her come to the surface and begin swimming toward the side of the pool. Malong then looked away for no more than 15 seconds, and when she looked back she could not see Katie. Malong immediately walked to the deep end of the pool to look for Katie and asked another counselor who was swimming toward the diving board if he had seen Katie. Malong then got into the pool and swam to the shallow end and then back to the middle of the pool, searching for Katie. The lifeguard assigned to watch the diving area finally saw Katie on the bottom of the pool, where she had been for about five minutes. She was taken to a hospital and died the next day.

Katie's parents sued the City and Malong for wrongful death, alleging negligence. Defendants moved for summary judgment, relying on the contractual release in the application form. The trial court denied the motion, and defendants petitioned the Court of Appeal for a writ of mandate to reverse that ruling. Denying the petition, the Court of Appeal concluded that under *Tunkl, supra,* 60 Cal.2d 92, the release was valid and enforceable as to any claim for ordinary negligence, but it also concluded, over the dissent of one justice, that the release was unenforceable as to a claim for gross negligence.

This court granted review on a single issue, the enforceability of the release as to a claim for gross negligence.

## II

Civil Code section 1668, which has remained unchanged since its enactment in 1872 as part of the original Civil Code, prohibits contractual releases of liability for "fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent." Also unchanged since its enactment in 1872 is Civil Code section 2175, which provides: "A *common carrier* cannot be exonerated, by any agreement made in anticipation thereof, from liability for the *gross negligence,* fraud, or willful wrong of himself or his servants." (Italics added.) The wording of Civil Code section 2175 shows that in 1872 the Legislature was well aware of gross negligence as a distinct category of wrong and that it chose to bar any agreement releasing a *common carrier* from liability for gross negligence. At the very same time, however, the Legislature omitted gross negligence from Civil Code section 1668's list of wrongful conduct that could *never* be the subject of a contractual release of liability.

Only one inference may be drawn: The Legislature made a conscious decision that releases for gross negligence—unlike releases for fraud, for willful injury to person or property, and for intentional or negligent violation of statutory law—are not *inherently* against the public interest and therefore are not *generally* and categorically unenforceable. In holding that contractual releases of liability for future gross negligence are *generally* unenforceable (maj. opn., *ante,* at p. 751), the majority rejects the Legislature's contrary decision, effectively rewrites Civil Code section 1668 to insert what the Legislature deliberately omitted (a general prohibition on contractual releases of liability for future gross negligence), and in so doing usurps the Legislature's authority. I do not join in that holding.

## III

Of course, the Legislature's decision, as embodied in the text of Civil Code sections 1668 and 2175, that contractual releases for future gross negligence

are not *inherently* against the public interest and therefore are not *generally* unenforceable, does not mean that such releases are *always* consistent with the public interest and therefore enforceable. Instead, the validity of a contractual release for future gross negligence must be determined by examining the context in which it occurs. Civil Code section 2175 identifies one context in which releases for future gross negligence are against the public interest and thus invalid—when the party seeking exoneration is a common carrier. Civil Code section 1668 does not preclude courts from determining that releases for gross negligence are against the public interest and invalid in other situations as well.

To determine whether the release at issue here is against the public interest and invalid as applied to gross negligence, I find guidance in this court's decision in *Tunkl, supra*, 60 Cal.2d 92. There, this court adopted an analysis to be used in determining whether a contractual release of future negligence claims is against the public interest and therefore unenforceable. We identified six factors or characteristics that "constitute the public interest" and thus provide "a rough outline of that type of transaction in which exculpatory provisions will be held invalid." (*Id.* at p. 98.) For an exculpatory provision to be held invalid, the transaction to which it relates need only exhibit some of those characteristics. (*Id.* at p. 101.) Although this court has never addressed the issue, it seems logical that, because gross negligence is a more aggravated form of misconduct than ordinary negligence, the public interest in deterring gross negligence is greater than the public interest in deterring ordinary negligence. Accordingly, to invalidate a release as to future gross negligence, the public interest showing under the *Tunkl* analysis need not be as strong or as complete as it would need to be to invalidate a release as to future ordinary negligence.

Under *Tunkl*, the first characteristic is that the release "concerns a business of a type generally thought suitable for public regulation." (*Tunkl, supra*, 60 Cal.2d at p. 98, fn. omitted.) Child daycare facilities are subject to public regulation under the California Child Day Care Facilities Act (Health & Saf. Code, § 1596.70 et seq.). Although Adventure Camp is exempt from regulation as a child daycare facility because it is operated for less than 12 weeks in a 12-month period during a time when local public schools are not in session (*id.*, § 1596.792, subd. (g)(1)), the City cannot deny that through the camp program it does indeed provide childcare services in the course of providing social and recreational activities for young children who are unaccompanied by their parents.[1] Accordingly, I conclude that at least insofar as it provides childcare services, the City's Adventure Camp is engaged in a type of business that is suitable for public regulation.

---

[1] The City allows parents to accompany their children to camp, but it does not require that they do so. The analysis here is limited to children not accompanied by parents.

The second characteristic under *Tunkl* is that "[t]he party seeking exculpation" (here, the City) "is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public." (*Tunkl, supra*, 60 Cal.2d at pp. 98–99, fns. omitted.) Affording opportunities for developmentally disabled children to participate in ordinary recreational activities with other children is a service of great public importance. The Legislature has declared that "developmental disabilities present social, medical, economic, and legal problems *of extreme importance*" that have "an important impact on . . . whole communities" (Welf. & Inst. Code, § 4501, italics added), that "[t]he State of California accepts a responsibility for persons with developmental disabilities" (*ibid.*), and that those persons have rights both "to social interaction and participation in community activities" and "to physical exercise and recreational opportunities" (*id.,* § 4502, subds. (f), (g)). Moreover, as I have explained, the City's program includes childcare services, and childcare itself has vital public importance. (*Gavin W. v. YMCA of Metropolitan Los Angeles* (2003) 106 Cal.App.4th 662, 672 [131 Cal.Rptr.2d 168].) Thus, I conclude that, through its recreational program for developmentally disabled children, the City provides services that are of great public importance.

In modern urban society, where both parents often hold full-time employment, many parents lack the time and resources to personally supply a full range of recreational and social opportunities for their children and instead rely on recreational camps and similar organized programs. This is particularly true for parents of children with developmental disabilities, because of the particular skills and adaptations required in dealing with those disabilities. Thus, recreational programs like Adventure Camp that are designed for developmentally disabled children are a "practical necessity" for parents seeking to provide a full range of ordinary recreational and social opportunities for those children. I conclude that through Adventure Camp the City provides services that are a practical necessity for many parents of developmentally disabled children.

The third *Tunkl* factor is whether "[t]he party holds himself out as willing to perform this service for *any* member of the public who seeks it, or at least for *any* member coming within certain established standards." (*Tunkl, supra*, 60 Cal.2d at p. 99, fn. omitted, italics added.) Here, although the City's Adventure Camp was limited to 20 participants at a time, the City made it available to *any* child between the ages of seven and 14 with a qualifying developmental disability. This circumstance is present.

The fourth *Tunkl* factor is whether "the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks [those] services." (*Tunkl, supra*, 60 Cal.2d at p. 100,

fn. omitted.) This factor is satisfied. Adventure Camp was limited to 20 children at a time, and those spots were always taken. Although the City allowed parents to choose which activities their children would participate in during camp sessions, the City alone determined the conditions for admission to Adventure Camp. Nothing in the record suggests that any parent ever bargained, or could have bargained, with the City concerning the terms of admission to the program.

The fifth *Tunkl* factor is whether the party seeking exculpation used "a standardized adhesion contract of exculpation" and did not offer the other party an option to "pay additional reasonable fees and obtain protection against negligence." (*Tunkl, supra*, 60 Cal.2d at pp. 100–101, fns. omitted.) Here, it is undisputed that the City's terms of participation, including the release, were offered to parents on a take-it-or-leave-it basis, with no opportunity to obtain protection against gross negligence for an additional fee.

The sixth *Tunkl* factor is whether "as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Tunkl, supra*, 60 Cal.2d at p. 101, fn. omitted.) Here, as a result of the transaction in which Katie's parents enrolled her in the City's Adventure Camp, Katie was placed under the care and supervision of the City's employees, subject to a significant risk of serious injury if they acted with gross negligence.

I conclude that each of the *Tunkl* factors is satisfied, at least to some extent, and that the characteristics of the particular transaction make the City's contractual release against public policy and unenforceable as to liability for injury caused by gross negligence.[2]

## IV

The City's Adventure Camp provides recreational and social activities to children with developmental disabilities. Because of the strong public interest in providing children with disabilities with opportunities for ordinary recreational activities and social interactions, it is essential that providers of those opportunities be held to at least a minimal standard of care. Applying a slight variation of the analysis that this court adopted in *Tunkl, supra*, 60 Cal.2d 92, I conclude that releases for gross negligence are not enforceable in this particular context. On this basis, I join the majority in affirming the Court of Appeal's judgment.

Moreno, J., concurred.

---

[2] I neither express nor imply any view concerning any other issue. In particular, I do not address whether the release is enforceable as to ordinary negligence or whether the evidence presented on the motion for summary judgment would be sufficient to establish gross negligence by either defendant.

**BAXTER, J.**, Dissenting.—In this matter we must determine whether a commonly worded release of future liability for negligence utilized by a public entity in connection with a publicly funded and publicly operated summer recreational program for developmentally disabled youth is enforceable under Civil Code section 1668 (section 1668), the statute defining the lawful parameters of releases in California. I conclude the Legislature has spoken; a full release of negligence liability, as was expressly agreed to by the parties below, is generally valid and enforceable under section 1668.

The majority, in contrast, concludes that all releases of future liability for gross negligence, whether express or implied, are generally unenforceable in California as contrary to the public policy of this state, and that the specific release of future negligence liability utilized by the city in this case, to the extent it implicitly encompasses gross negligence, "violates public policy and is unenforceable." (Maj. opn., *ante*, at p. 777.) The majority does not find section 1668 of much consequence in this matter, a position it must take because its conclusions and holding are based on policy determinations not discernable from the controlling statutory language.

I cannot join in the majority's sweeping holding. As this court long ago observed, "[t]he determination of public policy of states resides, first, with the people as expressed in their Constitution and, second, with the representatives of the people—the state Legislature." (*Jensen v. Traders & General Ins. Co.* (1959) 52 Cal.2d 786, 794 [345 P.2d 1].) " '[U]nless it is entirely plain that a contract is violative of sound public policy, a court will never so declare. "The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and . . . should be exercised only in cases free from doubt." ' " (*Ibid.*)

The Legislature, not this court, is in the best position to consider the public interests and determine whether good cause exists to amend section 1668 to uncategorically restrict releases of future tort liability to the extent they impliedly encompass a release of gross negligence liability. As regards the release utilized in connection with the public recreational services program for developmentally disabled youth directly in issue, although I acknowledge the general concern that grossly negligent misconduct not go unpunished, the public interests at stake here are far more complex than that one consideration alone. Whether it is in the public interest to restrict the means by which municipalities providing socially beneficial services to the public seek to manage their exposure to the specter of expanding tort liability in connection with the delivery of those services is a matter properly determined by the Legislature. I therefore respectfully dissent.

## I

Section 1668 provides that contracts having for their object, either directly or indirectly, the exemption of a party from "responsibility for his own fraud, . . . willful injury to the person or property of another, or violation of law," are "against the policy of the law." Put otherwise, one cannot lawfully contract away responsibility and future liability for his or her own acts of fraud, willful torts, or transgressions of statutory law. Section 1668, unchanged for 135 years and long understood to govern contractual releases of liability, neither declares nor prohibits releases of future liability for any type of negligence as being against the policy of the law in California.

The Legislature knows how to specifically proscribe the release of future liability for *gross negligence* when it wants to. It did so when it enacted Civil Code section 2175, which specifically prohibits common carriers from releasing future liability for gross negligence. In contrast, as Justice Kennard explains, "The Legislature made a conscious decision that releases for gross negligence—unlike releases for fraud, for willful injury to person or property, and for intentional or negligent violation of statutory law—are not *inherently* against the public interest and therefore are not *generally* and categorically unenforceable. In holding that contractual releases of liability for future gross negligence are *generally* unenforceable (maj. opn., *ante*, at p. 751), the majority rejects the Legislature's contrary decision, effectively rewrites Civil Code section 1668 to insert what the Legislature deliberately omitted (a general prohibition on contractual releases of liability for future gross negligence), and in so doing usurps the Legislature's authority." (Conc. & dis. opn. of Kennard, J., *ante*, at p. 783.)

There is one long-standing caveat to the express limitations placed on releases in section 1668. In *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441] (*Tunkl*), this court construed section 1668 as further precluding enforcement of exculpatory contractual provisions purporting to release a party from future liability for negligence if the transaction or subject matter of the contract in question "affects the public interest." (60 Cal.2d at p. 94.) We emphasized at the outset in *Tunkl* that "*no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party . . . .*" (*Id.* at p. 101, italics added.) But we went on to explain that where the subject matter of a contract affects the public interest, the relative bargaining positions of the parties are not the same as in a private, voluntary transaction. With regard to that category of transactions, "the releasing party does not really acquiesce voluntarily in the contractual shifting of the risk, nor can we be reasonably certain that he receives an adequate consideration for the transfer. Since the service is one

which each member of the public, presently or potentially, may find essential to him, he faces, despite his economic inability to do so, the prospect of a compulsory assumption of the risk of another's negligence." (*Ibid.*)

Observing that the "social forces" that characterize the "public interest" are "volatile and dynamic," and that "[n]o definition of the concept of public interest can be contained within the four corners of a formula" (*Tunkl, supra,* 60 Cal.2d at p. 98), we set forth a nonexclusive six-factor test in *Tunkl* for determining when a contractual transaction "affects the public interest." (*Id.* at pp. 98–101.) If "some or all" of the factors are present, enforcement of an exculpatory clause purporting to release liability for future *negligence* is prohibited as against the public interest. (*Ibid.*) The six *Tunkl* factors are: (1) the transaction "concerns a business of a type generally thought suitable for public regulation" (*id.* at p. 98, fn. omitted); (2) the party seeking exculpation performs a service "of great importance to the public, which is often a matter of practical necessity for some members of the public" (*id.* at p. 99, fns. omitted); (3) the service is offered to the public at large (*ibid.*); (4) in the economic setting of the transaction, the party seeking exculpation has a "decisive" bargaining advantage because the service is "essential" (*id.* at pp. 99–100); (5) the person obtaining the service is required to sign a "standardized adhesion contract of exculpation" (*id.* at p. 100, fn. omitted); and (6) the person obtaining the service bears the risk of the other party's carelessness (*id.* at p. 101).

The facts of *Tunkl* serve to illustrate the purpose and proper application of the rule announced therein. Hugo Tunkl sought admission to the University of California Los Angeles Medical Center, a hospital operated and maintained by the Regents of the University of California that held itself out to the public as an institution that performs medical services for qualified members of the public. (*Tunkl, supra,* 60 Cal.2d at pp. 94, 102.) The hospital-patient contract he was required to sign in order to gain admission to the facility included a form releasing "The Regents of the University of California, and the hospital from any and all liability for the negligent or wrongful acts or omissions of its employees, if the hospital has used due care in selecting its employees." (*Id.* at p. 94.) We observed: "That the services of the hospital to those members of the public who are in special need of the particular skill of its staff and facilities constitute a practical and crucial necessity [was] hardly open to question." (*Id.* at p. 101.) We also cited Health and Safety Code sections directly subjecting the facility to public regulation. (*Ibid.*) We then explained, "In insisting that the patient accept the provision of waiver in the contract, the hospital certainly exercises a decisive advantage in bargaining. The would-be patient is in no position to reject the proffered agreement, to bargain with the hospital, or in lieu of agreement to find another hospital. The admission room of a hospital contains no bargaining table where, as in a private business transaction, the parties can debate the terms of their contract.

As a result, we cannot but conclude that the instant agreement manifested the characteristics of the so-called adhesion contract. Finally, when the patient signed the contract, he completely placed himself in the control of the hospital; he subjected himself to the risk of its carelessness." (*Id.* at p. 102.)

In consideration of the facts in *Tunkl*, we had little difficulty concluding that the contractual terms under which Tunkl was admitted to the hospital affected the public interest and rendered the release of negligence liability unenforceable. "[T]he patient . . . sought the services which the hospital offered to a selective portion of the public; the patient, as the price of admission and as a result of his inferior bargaining position, accepted a clause in a contract of adhesion waiving the hospital's negligence; the patient thereby subjected himself to control of the hospital and the possible infliction of the negligence which he had thus been compelled to waive. The hospital, under such circumstances, occupied a status different than a mere private party; its contract with the patient affected the public interest." (*Tunkl, supra*, 60 Cal.2d at p. 102.)

In the case now before us, Katie Janeway, a 14-year-old developmentally disabled child, tragically drowned in a city-owned and -operated swimming pool while participating in a part-time summer recreational activities program for developmentally disabled children while under the supervision of a trained counselor functioning as a city employee. The tragedy is punctuated by the fact that the loss of this child occurred under circumstances where everyone concerned was plainly striving to ensure that Katie might simply enjoy a normal summer day camp experience notwithstanding her developmental disabilities.

A completed application for enrollment in the Adventure Camp program required the execution of a form releasing the city and its employees from all liability "for any loss, damage, or claim therefore on account of injury . . . whether caused by any negligent act or omission of the releasees or otherwise." Maureen Janeway, Katie's mother, signed the release on the minor's behalf. In doing so, she agreed to "assume full responsibility for and risk of bodily injury [and] death" arising from Katie's participation in the program, and further "expressly agree[d] that the . . . release and waiver, indemnity agreement and assumption of risk are intended to be as broad and inclusive as permitted by California law." She had signed similar releases covering Katie's participation in the Adventure Camp program in three prior years.

The express proscriptions of section 1668 are not implicated here—plaintiffs are not alleging any fraud, willful injury, or violation of a statute by the city or its employees. The complaint simply alleges wrongful death on a theory of negligence—gross negligence is not specifically alleged. Defendants moved for summary judgment on the basis of the release, the city

arguing that Adventure Camp, unlike the hospital in *Tunkl*, was an elective summer recreational program for disabled children, enrollment in which did not affect the public interest, and that accordingly the release of future negligence liability resulting from injury or death of a camp participant was fully enforceable under section 1668 as interpreted by *Tunkl*. The trial court denied summary judgment and the city petitioned for a writ of mandate. The Court of Appeal correctly understood the principal issue to be whether the contractual agreement through which Katie was accepted into the Adventure Camp program is of a nature that affects the public interest within the meaning of *Tunkl*. If not, then the release signed by the minor's mother on her behalf is fully enforceable under section 1668, as construed in *Tunkl*, and serves to release the city from future liability for negligence.

Based on analysis of the *Tunkl* factors, the Court of Appeal concluded that "the release is valid and enforceable as a matter of law to the extent it releases the City and [its employees] from liability for acts of ordinary negligence in the operation of the City's recreational program for disabled children. Undisputed evidence establishes that the circumstances under which the release was executed by the Janeways did not have the characteristics of a contract of adhesion or pertain to an essential activity that was a matter of practical necessity to them. Therefore, although offering opportunities to disabled children is clearly beneficial to the public, the 'public interest,' as that term is used in *Tunkl*, would not be served by invalidating the release as to ordinary negligence."

Although the Court of Appeal referred to the enforceable release of "ordinary negligence" in the passage quoted above, it can be observed that no distinction is drawn between ordinary and gross negligence in either (1) the allegations of plaintiffs' complaint; (2) the express wording of the city's release of negligence liability here in issue; or (3) this court's analysis in *Tunkl* by which we concluded section 1668 must be interpreted as invalidating *only* contractual releases of future negligence liability that affect the public interest. The Court of Appeal nonetheless found the distinction pivotal to the second part of its analysis. Over the dissent of one justice, the Court of Appeal went on to carve out an exception for gross negligence, concluding that "the release does not exculpate the City or [its employees] from liability for conduct constituting gross negligence . . . . Public policy and the legitimate objective of the release dictate that we limit the scope of the release to ordinary negligence by the City, and exclude the more extreme and aggravated conduct that constitutes gross negligence."

We granted review solely to consider the correctness of this specific aspect of the Court of Appeal's holding, for it was without precedent in California. As the majority acknowledges, until this case, "no published California case

has upheld, or voided, an agreement purporting to release liability for future *gross* negligence." (Maj. opn., *ante*, at p. 758.)

The majority embraces this holding of first impression by the divided Court of Appeal. It goes much further. The majority does not limit its holding to the question posed on the facts of the case directly before us—whether a full release of future liability for negligence utilized by a *public entity* in connection with a *publicly funded* and *publicly operated* summer recreational program for developmentally disabled youth is enforceable under section 1668 as construed in *Tunkl*. It concludes instead that all releases of future liability for gross negligence, whether express or implied, are generally unenforceable in California as contrary to the public policy of this state, and specifically holds that the broad release of future negligence liability utilized by the city in this case, to the extent it implicitly encompasses gross negligence, "violates public policy and is unenforceable." (Maj. opn., *ante*, at p. 777.) The majority's conclusions and holding are not limited to releases of future negligence liability made in the specific context of sports or recreational activities. They rest on a broader policy concern—the general concern that aggravated wrongs or grossly negligent misconduct not go unpunished—and presumably apply to implied as well as express releases of liability for gross negligence (here the release is silent as to gross negligence), and to public and private transactions alike, regardless of whether they affect the public interest within the meaning of *Tunkl*'s interpretation of section 1668.

Unlike the majority, I conclude the city's release of liability for "any negligent act or omission" leading to injury or death in connection with the operation of its recreational Adventure Camp program for developmentally disabled youth is valid and fully enforceable under section 1668 as interpreted in *Tunkl*.

California courts have uniformly held that *Tunkl* does not invalidate releases of future liability for negligent infliction of injuries in the context of sports and recreational activities on the reasoning that, although beneficial, such activities are generally not services *essential* to the public and thus do not affect the public interest. (See, e.g., *Lund v. Bally's Aerobic Plus, Inc.* (2000) 78 Cal.App.4th 733, 739 [93 Cal.Rptr.2d 169] [release of liability in connection with health club/gym membership]; *Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 162 [21 Cal.Rptr.2d 245] (*Randas*) [release of liability in connection with YMCA swimming program]; *Okura v. United States Cycling Federation* (1986) 186 Cal.App.3d 1462, 1467 [231 Cal.Rptr. 429] [release of liability in connection with nonprofit-sponsored bicycle race].) Accordingly, to require a party to sign an exculpatory release as a condition of participation lacks the compulsion typically found in a contract of adhesion and would not impair the public

interest or violate public policy. (See *YMCA of Metropolitan Los Angeles v. Superior Court* (1997) 55 Cal.App.4th 22, 26 [63 Cal.Rptr.2d 612]; *Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1372 [59 Cal.Rptr.2d 813].)

As the Court of Appeal below observed, releases have been enforced not only for high-risk sports activities, but for less risky recreation, and in particular, where the recreational activity was directed at or included participation by children. (See, e.g., *Platzer v. Mammoth Mountain Ski Area* (2002) 104 Cal.App.4th 1253 [128 Cal.Rptr.2d 885] [parents' release of liability on behalf of eight-year-old child participating in skiing school]; *Hohe v. San Diego Unified Sch. Dist.* (1990) 224 Cal.App.3d 1559 [274 Cal.Rptr. 647] (*Hohe*) [parents' and teenager's release of liability in connection with her participation in school hypnosis demonstration].) Swimming and diving are two of the recreational activities offered to developmentally disabled children through Adventure Camp, when authorized by the child's parents or legal guardian. Katie was swimming and diving in the city pool with the express knowledge and written consent of her mother when her fatal accident occurred.

Our decision in *Tunkl* directs courts in this state to determine the validity of releases of future negligence liability on a case-by-case basis, with emphasis on whether the type of service being offered is essential to the public, and whether a disparity of bargaining power compels the party obtaining the service to sign the release as a contract of adhesion. (*Tunkl, supra,* 60 Cal.2d at pp. 99–100; see also *YMCA of Metropolitan Los Angeles v. Superior Court, supra,* 55 Cal.App.4th at p. 26.)

The first *Tunkl* factor is whether the release in question concerns "a business of a type generally thought suitable for public regulation." (*Tunkl, supra,* 60 Cal.2d at p. 98, fn. omitted.) Child daycare facilities are subject to public regulation under the California Child Day Care Facilities Act. (See Health & Saf. Code, § 1596.70 et seq.) Adventure Camp, however, is exempt from regulation as a child daycare facility because it is operated for less than 12 weeks in a 12-month period during a time when local public schools are not in session. (*Id.,* § 1596.792, subd. (g)(1).) Nor is the program subject to regulation under the Lanterman Developmental Disabilities Services Act. (Welf. & Inst. Code, § 4500 et seq.)[1] Unlike the facts of *Tunkl,* which involved a public hospital subject to direct public regulation under the Health and Safety Code, plaintiffs here identify no other statute or regulation to support a finding that the first *Tunkl* factor applies.

---

[1] The Lanterman Developmental Disabilities Services Act (Welf. & Inst. Code, § 4500 et seq.) expresses legislative goals of integrating individuals with developmental disabilities into mainstream life, and ensuring that such individuals are accorded the same rights as others to participate in recreational and other programs that receive state funds. (Welf. & Inst. Code, §§ 4501, 4502.) Adventure Camp is exempt from direct regulation under the act.

The second *Tunkl* factor is that the party seeking exculpation (here, the city) "is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public." (*Tunkl, supra,* 60 Cal.2d at pp. 98–99, fns. omitted.) In its briefing before this court, the city "does not question that its various recreational services programs confer an important benefit on the public and that it is important that people with all kinds of disabilities have an equal opportunity to participate in these recreational services and programs." But the city points out that the program here in question was designed to offer the same kinds of recreational services to developmentally disabled children as the city offered to nondevelopmentally disabled children. As the city explains, "[it] was not designed to offer—and did not offer—therapy or any other special service for children with special needs." As already observed, courts in this state have uniformly held that *Tunkl* does *not* invalidate releases of negligence liability for injuries arising from sports and recreational activities on the reasoning that, although beneficial, such activities are generally not services *essential* to the public and thus do not affect the public interest. (*Ante,* at p. 791.) Indeed, no reported California case until this one has made an exception for an implied release of gross negligence in any context, whether involving sports or recreational activities or otherwise.

Nor do plaintiffs point to any California decision or statute declaring that recreational activities for the developmentally disabled are essential or a matter of practical necessity within the meaning of the second *Tunkl* factor. The Adventure Camp program was offered for only three weeks in the summer of 2002, and then only for a period of 15 hours per week. There has been no showing that Adventure Camp was the only program of its kind available to accommodate the recreational needs of developmentally disabled children in the Santa Barbara vicinity, and indeed, as the city points out, Katie, either with the assistance of her parents or other adults trained to attend to her special needs, could have gone swimming in this city-owned and -operated public swimming pool even without enrolling in the camp program.

The third *Tunkl* factor is whether "[t]he party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards." (*Tunkl, supra,* 60 Cal.2d at p. 99, fn. omitted.) Here, although the city's Adventure Camp program was technically available to any child between the ages of seven and 14 with a qualifying developmental disability, as a practical matter enrollment was limited to 20 participants at a time.

The fourth *Tunkl* factor is whether "the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the

public who seeks [those] services." (*Tunkl, supra,* 60 Cal.2d at p. 100, fn. omitted.) Although the city determined the basic conditions for enrollment in the camp program, it allowed parents to exclude activities in which they did not want their children participating during the camp sessions. The record further reflects that Katie's parents were offered the opportunity to require her to wear a flotation device at all times while swimming in the pool during camp. They felt she was a strong swimmer and declined. The city also indicates evidence was presented below "showing Katie participated in numerous recreational activities outside of Adventure Camp, including physical education at school, Special Olympics volleyball and basketball, horseback riding, and water sports such as swimming, diving, tubing and water skiing."

The fifth *Tunkl* factor is whether the party seeking exculpation used "a standardized adhesion contract of exculpation" and did not offer the other party an option to "pay additional reasonable fees and obtain protection against negligence." (*Tunkl, supra,* 60 Cal.2d at pp. 100–101, fns. omitted.) Here, the city has conceded that the Adventure Camp release was a standard form release utilized for various city-run recreational programs, and was indeed offered on a take-it-or-leave-it basis. But according to the city, the *activities* to which the release applied were negotiable, and Katie's parents could have also modified her activities while in the pool to minimize any risks. The Janeways had the option of customizing Katie's camp experience by substituting other activities for pool time. They could have restricted or prohibited her swimming altogether, or given special instructions for that activity, or checked the box on the form requiring that she use a flotation device at all times, and they also had the option of sending Katie to camp along with a personal aide of their own choosing, or to attend camp along with Katie and supervise her themselves.

The sixth and final *Tunkl* factor is whether "as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Tunkl, supra,* 60 Cal.2d at p. 101, fn. omitted.) As the city explains, "[A]lthough Katie was admittedly placed under the control of the City when she participated in Adventure Camp, as has been shown, plaintiffs had many options for avoiding any risk of carelessness by the City—and could have retained full control over Katie by attending Adventure Camp with her."

In sum, Adventure Camp provides elective and nonessential recreational opportunities for developmentally disabled youth on a part-time basis in a summer day camp setting. Moreover, unlike the release in *Tunkl,* which the patient had to sign on a take-it-or-leave-it basis in order to be admitted into the hospital for critical medical treatment, here the application and release

required to be completed for enrollment of a child in the elective recreational program have none of the usual attributes of a contract of adhesion. The Janeways ultimately retained control over whether Katie would swim in the pool as one of her camp activities, and whether she would be required to wear a flotation device at all times if she did so. They authorized her to swim and to dive, and opted not to require her to wear a flotation device when in the pool participating in those activities. The city, on its part, chose to assign a trained counselor specifically to keep close watch over Katie while she was swimming or diving in the pool.

Although the importance of integrating developmentally disabled children into mainstream society through programs like Adventure Camp cannot be overstated, elective participation in this particular recreational camp program did not affect the public interest within the meaning of our analysis and holding in *Tunkl*. Nothing else in section 1668, the controlling statutory provision, proscribes the full release of negligence liability utilized by the City in this case. As a general matter, in the absence of fraud, overreaching or excusable neglect, a duly executed release of liability is a lawful "express assumption of the risk." (*Madison v. Superior Court* (1988) 203 Cal.App.3d 589, 597, fn. 6 [250 Cal.Rptr. 299]; see *Hulsey v. Elsinore Parachute Center* (1985) 168 Cal.App.3d 333, 339 [214 Cal.Rptr. 194].) " ' "In its most basic sense, assumption of risk means that the plaintiff, in advance, has given his *express* consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone. [Fn. omitted.] . . . The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence." (Prosser & Keeton, Torts (5th ed. 1984) § 68, pp. 480–481, italics in original.)' [Citation.]" (*Madison v. Superior Court, supra,* 203 Cal.App.3d at p. 597.) The Janeways, like countless parents of children participating in recreational activities posing some level of inherent risk, were asked to give up their right to sue for negligence. There is no evidence establishing that the release in this case, which expressly covered "any negligent act or omission," fell outside their reasonable expectations, or was unduly oppressive or unconscionable.

I would therefore hold the release valid and fully enforceable under section 1668 and *Tunkl*, and stop there. Like Justice Kennard, I conclude the majority inappropriately relies on decisions from other jurisdictions in support of its broad holding that public policy generally precludes enforcement of releases of future liability for gross negligence. (Maj. opn., *ante,* at p. 777.) That broader question should not be reached on the facts of this case, which does not involve a contractual release of negligence liability affecting the public interest within the meaning of *Tunkl*, and which does not involve a release of liability otherwise falling under the express proscriptions of section 1668. Given that controlling statute, which, even as construed in *Tunkl*, does not

expressly prohibit the release of future liability for negligence in the context in which it was utilized here, the broader question considered by the majority is one more appropriately addressed to the Legislature rather than decided by this court.

There are competing public policies at play here. One such policy, relied on by the majority to the exclusion of all others, is the general concern that grossly negligent misconduct not go unpunished. But enforcement of broad releases of negligence liability utilized by cities or other public agencies in the youth recreational services setting may further the public interest by enabling municipalities to deliver affordable recreational services to children with developmental disabilities under the same terms as they provide such services to other children. As several courts have observed, " '[T]he public as a whole receives the benefit of such waivers so that groups such as Boy and Girl Scouts, Little League, and parent-teacher associations are able to continue without the risks and sometimes overwhelming costs of litigation. Thousands of children benefit from the availability of recreational and sports activities. Those options are steadily decreasing—victims of decreasing financial and tax support for other than the bare essentials of an education. Every learning experience involves risk. . . . No public policy forbids the shifting of that burden.' " (*Randas, supra,* 17 Cal.App.4th at p. 162, quoting *Hohe, supra,* 224 Cal.App.3d at p. 1564.)

The Legislature, unlike this court, has the resources and is in the best position to balance the interests of the public at large and all persons specifically interested in the availability of publicly funded recreational services programs for disabled youth. The paramount concern here is to ensure that the law of releases of liability, as applied to this case, preserves and advances the public's best interests. It goes without saying that a fundamental concern in the public's interest is the continued viability of such socially beneficial programs in these fiscally strapped times. The City Attorney of Santa Barbara, as a party to the case, and the League of California Cities and the California State Association of Counties, as amici curiae, suggest that the unavailability to public entities of broadly worded releases of negligence liability such as was utilized in this case could stand to compromise the availability of publicly funded and publicly administered recreational services programs such as this one. Whether it will ultimately serve the public interest to restrict the means by which municipalities providing socially beneficial services to the public seek to limit their exposure to expanding tort liability in connection with such programs is a matter properly determined by the Legislature. The answer, for example, may turn on whether insurance or the ability to self-insure will remain available and cost effective in the face of a change in the law restricting the scope of releases available to public entities offering programs such as this one. Unlike the majority, I believe the public interests at stake here are far more complex

than the general concern that grossly negligent misconduct not go unpunished. The Legislature, not this court, is in the best position to sort them out and determine whether good cause exists to enact the formidable revision of the law of releases which the majority adopts by judicial fiat today.

## II

I conclude section 1668 and *Tunkl* together control this case and dictate that the release in question be found valid and enforceable. Any further change in the law of releases of tort liability generally, or the law pertaining to releases of negligence liability by public entities in connection with publicly administered recreational services programs specifically, should come from the Legislature.